# Enoch S. Hill *vs.* John Smith & others.

### *Error to Henry.*

A sealed note, given for improvements on the public lands, is not part of an ille-gal contract, and is collectable.

It is competent for the legislature to render *illegality of consideration*, no defence to an action on any contract.

The mere attaching a penalty to an act, does not necessarily invalidate all contracts in relation to that act; the effect in that respect, is not the same as though the act had in express terms, been absolutely prohibited. Where the act is not in-trinsically wrong, nor contrary to public policy, but a mere penalty affixed to it, the payment of this penalty satisfies the law, which reaches no further than that penalty.

It is contrary to the spirit of our institutions, to revive without *notice*, a penal statute, grown obsolete by long disuse; especially when the general current of legislation shows the statute to have been regarded by the legislature as no longer in force. Custom can repeal a statute.

The facts are set forth in the opinion of the court. The case was submitted without argument.

LEARNED, for plaintiff in error.

RICH, for defendant in error.

BY THE COURT, MASON, CHIEF JUSTICE.—This was an action of debt, brought upon a single bill or sealed note, of which the following is a copy:

" BURLINGTON, Jan. 23, 1837.

" $1000    Twelve months after date I promise to pay to John Smith & Brothers, or order, one thousand dollars, for value received. Witness my hand and seal, as above written.    E. S. HILL, [SEAL."]

The defendant pleaded *non est factum*, with notice of special matter under the statute. By mutual consent, the cause was submitted to the court below upon the following facts:

" 1. It is admitted in evidence that the writing obligatory in the plaintiff's said declaration mentioned, was executed and delivered to the said plaintiff by the said defendant, according to the tenor thereof.

" 2. It is admitted in evidence, that the said firm of John Smith and Brothers, existed at the time of the execution of said writing obligatory, that Henry Smith one member of said firm, is dead, and that the other members of said firm survive, by whom, and for whose use this suit is prosecuted, as also appears of record in said caus▉▉.

" 3. It is admitted in evidence, that the said w▉▉ng obligatory in the plaintiff's said declaration mentioned, was made and delivered to the said plaintiffs, by the said defe▉dant, for the consideration money agreed to be paid by the defendant to the plaintiffs, for the purchase of a claim, or the possessory right to a certain tract or parcel of land, belonging to the United States of America, situated in Desmoines county, in the territory of Iowa, aforesaid, containing about three hundred acres more or less, on which there were valuable improvements, and seventy-five acres or more of said tract enclosed with a fence.

" 4. It is admitted in evidence, that the said plaintiffs, at the time of making said writing obligatory, were and ever since have been, non-residents of the territory of Iowa, and are residents of the city of St. Louis, in the State of Missouri. "

The court below rendered a judgment in favor of the plaintiffs for $1000 debt, and $63,83 damages, upon which the defendant brought his writ of error, to obtain a reversal of that judgment, and assigned the following errors:

" 1. The said writing obligatory in the plaintiffs said declaration mentioned was given for a contract for the purchase of a claim, to a tract of the United States lands with the improvements thereon, in violation of the provisions of the several acts of Congress, upon that subject made and provided.

" 2. The whole contract, for which the said writing obligatory was

given, is contrary to the laws of the United States, and is therefore void."

The statute of Wisconsin, which was in full force here at the time this instrument was executed, declares " that all contracts, promises, assumpsits or undertakings, either written or verbal, which shall hereafter be made in good faith, and without fraud, collusion or circumvention, for the sale, purchase or payment of improvements made on the lands, owned by the government of the U. States shall be deemed valid in law, or equity, and may be sued for and recovered as in other contracts." Laws of 1836, p. 23. If this statute is of any validity, it closes the door to all further controversy, in relation to this matter.

But this act is said to be of no force and effect, being in contravention of an existing paramount law of the United States. The law here referred to, is the act of March 3, 1807, entitled " An act to prevent settlements being made on lands ceded to the United States until authorized by law." Admitting that this act altogether prohibits any settlement upon the public domain, and that it was in full force at the date of the instrument on which this suit was brought, we consider it by no means conclusive against the plaintiffs right to a recovery.

As a general rule, illegality in the consideration will prevent the enforcement of any contract, even though (as in the present case) it be under seal. This is a salutary principle, but who will contend that it is absolutely inflexible? Is it beyond the power of legislation, to modify or abridge the rule, or even to abolish it altogether? Is it surrounded with all that sacred inviolability, which so justly attaches to a constitutional provision? Suppose the public welfare should require an innovation upon this rule, is it placed beyond the reach of legal enactments? We have never heard such an idea advanced, and we consider it entirely within the province of the legislature, when they deem it expedient, to render all notes (whether sealed or unsealed) collectable; whatever might have been the consideration therefor. What they could thus accomplish in the aggregate, they may certainly do in the detail. They may therefore declare, that a certain species of illegality in the consideration, shall not so vitiate a written instrument, as to prevent a recovery thereon.

The act of 1836, has at least had this effect. If prior to that statute the sale of improvements on the public lands was an illegal consideration, the law has at least prevented the defendant from setting up that species of illegality for the purpose of defeating the plaintiffs action.

There were excellent reasons for such a legislative interposition.—

At the time this law was passed, there were more than ten thousand inhabitants within the present limits of this territory (then a part of Wisconsin) residing on the lands of the United States and daily dealing in what were denominated "claims," or the settlers rights to those lands. Public policy dictated that there should be some better sanction to enforce the observance of their contracts, than the bludgeon or the rifle. The legislature therefore declared, that such contracts should be under the peaceful sway of the civil magistrate, rather than that the whole country should be overwhelmed with the miseries of violence and anarchy. We believe that in so doing they were not only promoting the public welfare, but that they were acting entirely within their legitimate province, and that the law therefore, for this purpose, is valid and binding.

But does the act of 1807 prohibit the sale of improvements on the public lands, in such a manner as to render all such contracts illegal? It provides "that if any person or persons, shall, after the passing of this act, take possession of, or make a settlement on any lands ceded or secured to the United States, by any treaty made with a foreign nation, or by a cession from any State to the United States, which lands shall not have been previously sold, ceded, or leased by the United States, or the claim to which lands, by such person or persons, shall not have been previously recognized and confirmed by the United States; or if any person or persons, shall cause such lands to be thus occupied, taken possession of or settled, or shall survey or attempt to survey, or cause to be surveyed any such lands, or designate any boundaries thereon by marking trees or otherwise, until thereto duly authorized by law, such offender or offenders shall forfeit all his or their right, title or claim, if any he hath or they have, of whatsoever nature or kind the same shall or may be to the lands aforesaid which he or they shall have taken possession of or settled, or caused to be occupied, taken possession of or settled, or, which he or they shall have surveyed, or attempted to survey, or caused to be surveyed, or the boundaries thereof, he or they shall have designated or caused to be designated by marking trees or otherwise. And it shall moreover be lawful for the President of the United States, to direct the Marshal or officer acting as Marshal in the manner hereinafter directed, and also to take such other measures and to employ such military force as he may judge necessary and proper, to remove from lands ceded or secured to the United States, by treaty or cession as aforesaid, any person or persons who shall hereafter take possession of the same, or make or attempt to make a settlement thereon, until there-

10

unto authorized by law. And every right, title or claim forfeited under this act shall be taken and deemed to be vested in the United States, without any other or further proceedings."

The act then goes on to authorize persons who have previously settled on the public lands, to remain, upon complying with certain conditions therein prescribed, and concludes by declaring it lawful for the proper Marshal, under the instructions of the President, to remove any person not thus authorized to remain. Three months notice is to be given prior to such removal, and any person found thereon after the expiration of that time, incurs thereby a penalty of $100 and is liable to imprisonment at the discretion of the court for any term not exceeding six months. (Laws U. S. vol. 4 page 118.)

It will be observed that this statute does not in express terms prohibit the settlement and occupancy of the public lands, but merely declares that such trespasser shall forfeit his rights, &c., that the President shall have power to direct his removal, and that after that power has been exerted, and the requisite notice given, a further penalty is inflicted on the transgressor.

It may well be questioned, whether this law if in full force, would invalidate a contract for the sale of improvements on public lands, even without the aid of our statute. We are not now inquiring whether such a sale would constitute a valid consideration, but whether, even if there had been in other respects, a good and valuable consideration, the contract is, notwithstanding so vitiated, as to be rendered absolutely null and void. Upon this point many decisions will be found in the reports of almost every court.

In the case of Fox vs. Abel, 2 Conn. Rep. 548 it was decided that a note given on Sunday was void, because the statute of that State prohibited all secular business on that day. But in Massachusetts, where the law fixes a *penalty* for the transaction of such business on that day, such notes have been held valid. Geer vs. Putnam, 10 Mass. 312.

It has also been decided in England, that where a fair was held on Sunday, the sales were not void although there was a penalty on the party selling on that day. Comyns vs. Boyer, Cro. Eliz. 485. And in the case of Gremore vs. Le Clerc Bois Vallon, 2 Camp. 144, the court held that a person unauthorized to practice as a surgeon, might maintain an action for services in that capacity, although by law such a person was liable to a penalty of five pounds per month for

performing those very services, "*the act containing no prohibitory clause.*"

The case of Wheeler vs. Russel, 17, Mass 257, has been particularly referred to by the counsel for the plaintiff in error. That was an action upon a promissory note, given for shingles sold in contravention of the statute of that State. From the report of the case it would seem, that although the penalty of forfeiture was by the law of that State attached to any sale of shingles which were not of statutory dimensions, or, which had not been surveyed, the statute went further and absolutely prohibited such sale.

In the Springfield Bank vs. Merrick, et al., 14 Mass. 322, a note was declared void which had been given in violation of the statute of that State prohibiting any banking company from loaning or negotiating any notes of unincorporated banking companies, under a penalty of $1000. This may appear somewhat at variance with the general current of the authorities above quoted, but the reasons of that decision seem to have been drawn, in a very great degree, from the fact that the general intention of the statute was, to prohibit the banks from loaning or dealing in the notes of unincorporated banking companies, that such traffic was contrary to the policy and object of the law, and the contract was therefore void for illegality.

The rule to be drawn from these cases, therefore appears to be, that where an act is absolutely prohibited by statute, or is contrary to public policy, all notes, &c., given in furtherance of that act, are null and void; but where the statute fixes a mere penalty, contracts in relation to matters which subject the maker to that penalty, are not on that account invalidated. Where not intrinsically wrong, the individual is permitted to perform the act upon the payment of the penalty. This is a species of license money, exacted for the privilege of doing a certain thing, but the act is not otherwise unlawful, unless expressly declared so. This seems to correspond with the views of the great English commentator in relation to actions that are merely *mala prohibita.* 1 Black. Com. 57.

Applying this rule therefore to the present case, there is nothing in the sale of improvements on the public lands, which independent of the statute, should render the contract void for illegality. He must be a bold man, who would assert that the occupancy of the public lands, in the manner practised in the settlement of this territory, was in itself contrary to good morals or public policy. At the worst then it is merely a case of *malum prohibitum,* an instance moreover wherein the law has not absolutely forbidden the act, but has merely attached a penalty

to its performance.   Subject to this penalty,  any person has the same
right  to occupy or traffic in  the  public lands, as  though  the statute of
1807 had not been  passed.   If  that had been  the  case the sale of im-
provements theron should at most be regarded  in the same  light as the
ordinary sale of property to which the vender had no title.   This might
constitute a defence where want of consideration would be sufficient, but
where no fraud or deception had been practised, would never render the
instrument now before as invalid.

But the act of Congress of 1807, seems to have been intended, merely
to  prevent the acquirement of title by occupancy, and to authorize the
removal of intruders in those cases  where public  policy should require;
but never to disturb the peaceable  and industrious  husbandman whose
labor  was adding  so much to  the  public wealth,  changing the  barren
wilderness into  fertile  fields, and calling  into almost  magic existence,
whole States  and  territories, whose  prosperity  and  power  are con-
stantly adding so much to the strength and glory of the nation.

But even if  that act was  originally  intended  to  prevent  entirely all
settlements on the  public lands, and if under such circumstances territo-
rial  legislation would  have  been  wholly incompetent to  render notes
&c., collectable, which  had been  given in  furtherance of objects illegal
under that statute, there is  still another matter of  serious importance to
be considered.   Is that law for these purposes still in operation?

The act in question was  passed in 1807,  and it is a matter of public
history, that since that  period  it has  never been  exercised  to  prevent
the ordinary  settlement of  the public lands.   The  cases  wherein the
President has availed himself of  the powers therein conferred, have all
been special,  as where trespassers were  committing  waste without the
design of making a  settlement, or  otherwise enhancing the  value of the
land.   Nay, so far  from  discountenancing such  settlements, special
encouragments  thereto have been offered.   In numerous instances re-
wards have been conferred by acts of Congress on those  who had taken
possession of,  cultivated and  trafficed in  the public domain.   The
many pre-emption laws which have been passed from time to time, have
all given a recompense to those who had settled upon and improved those
lands.   Some of these too, have recognized the validity of contracts pre-
viously made, between landlords and tenants, which would have been
equally void for illegality as any other contracts  growing out of  these
alleged trespasses.

But further than this,  governments have  been organized by  acts of
Congress for the express benefit of a community of criminals (agreeably

to the notions of the counsel for the plaintiff in error,) the effect and evident intention of which, was to encourage and facilitate their *illicit* conduct and purposes. It is notorious that when this territory was organized, not one foot of its soil had ever been sold by the United States, and but a small portion of it (the half breed tract) was individual property. Were we a community of trespassers, or were we to be regarded rather as occupying and improving the lands of the government by the invitation and for the benefit of the owner? Were we organized as a colony of malefactors, or shall we not rather absolve the federal government from the charge of such stupendous folly and wanton wickedness?

Let us suppose that the next week after our territorial organization, the President had directed the Marshall to remove with the least possible delay the whole of our twenty-five thousand people, (excepting the few settlers on the half breed lands and the still fewer who would have been entitled to remain by virtue of pre-emption privileges,) ought such a command to have been obeyed? We do not ask what would have been the determination of our settlers, but what would the strictest duty have demanded of them? We have no hesitation in saying that such a command would have been altogether illegal, and ought not to have been obeyed.

To make this appear still more evident, let us farther suppose that the requisite notice to quit having been given and disobeyed, the offenders were brought before the proper courts for trial. To say nothing of the utter impracticability of executing such a law, would the courts be justified in giving it efficacy? If jurors could be obtained who would find the accused guilty, should the judge proceed to pass sentence? If so the great mass of our citizens must be liable to be fined $100 each and might in addition be hurried off to prison for the period of six months. And for what? For violating a law of which the great majority knew not the existence, a law which had lain unexerted for such a purpose during more than thirty years, and ever since its enactment. Would this be in accordance with the intentions of the legislature? If so the law was intended as a snare. Allurements of the most enticing kind were freely employed to decoy the unsuspecting and the innocent within its reach. Its position and character were concealed by the dust and rubbish of a third of a century, the broad and beaten path of custom leading directly across it, had obliterated every apparent vestige of its existence. Suddenly, and when thousands are within its reach, the net is sprung and they are enfolded in its treacherous toils.

Whole communities of unoffending citizens find themselves liable to heavy amercements, and long incarceration for doing acts which they had every reason to believe would be deemed patriotic and praiseworthy, for leading the way in the introduction of wealth and civilization and happiness into the almost illimitable west; for sacrificing the comforts and endearments of home and enduring the hardships and privations, and encountering the diseases of a new and untried country; for building up great communities in the wilderness, enlarging our bounds of empire and vastly augmenting the current of our national revenue. For doing these acts which have redounded so much to the national advantage— done too in accordance with the almost express invitation of the national legislature, and when encouragement to western emigration had become a part of our settled national policy, these individuals, where they had every reason to expect rewards—nay, while on the one hand they are actually receiving such rewards, they feel themselves on the other, condemned to severe and even ignominious punishment. Does the spirit of our institutions justify such stupendous deception and wholesale tyranny? We answer emphatically, NO.

History furnishes us with a parallel example, and one which it may be profitable to contemplate for a moment. Henry the seventh, of England, in order to replenish his treasury, had recourse to a measure which (in order that the plaintiff in error should succeed) must be legitimate here. Availing himself of the services of two judges—the supple instruments of his tyranny—he caused a general system of prosecutions to be instituted upon penal statutes which had never been repealed, but which by long disuse had become forgotten and wholly disregarded. Empson & Dudley, when afterwards brought to trial for their share in these transactions, pleaded "that it belonged not to them who were instruments in the hands of supreme power to determine what laws were recent or obsolete, expedient or hurtful, since they were all alike valid so long as they remained unrepealed by the legislature." (Hume's History of England.) But this plea neither availed them with their judges nor with posterity. They were consigned to dishonored graves, and their memories have ever since been coupled with judicial infamy.

It is true that public opinion would frequently be a very unsafe guide for a judicial decision. The fluctuating feelings of the multitude frequently operated upon by momentary excitement, by prejudice or by caprice would very improperly be adopted as the standard of truth or sound reason. But where the same opinions are concurred in for centuries, and after passion and prejudice have wholly subsided, such

opinions are always founded in truth and justice, and can more safely be followed than those of the most learned and able judges.

Fortified by this authority, we pronounce it contrary to the spirit of that Anglo Saxon liberty, which we inherit to revive without notice, an obsolete statute, one in relation to which long disuse and a contrary policy had induced a reasonable belief that it was no longer in force. If custom can make laws, it can when long acquiesced in, recognized and countenanced by the sovereign power, also repeal them.   Such has been the case in the example now before us.   We feel therefore justified in declaring that the act of March 3, 1807, so far as it would have gone to authorize the removal of the inhabitants of this territory, or their punishment as criminals is wholly inoperative and void, that it has been repealed by long *non user*, by the enactment of other and irreconcileable statutes, by the establishment of an opposite policy, and by the legislative recognition of wide spread and long established customs among the people of the west, which are wholly incompatible with such an operation of this statute.   If this measure can be sanctioned then is there nothing to prevent Congress from laying these snares by premeditation and beguiling the unwary by thousands with the express design of filling the coffers of the public treasury, thus introducing into this republic a practice which forms one of the darkest stains on the character of one of the most arbitrary and unscrupulous of English tyrants.   Courts of justice can never become accomplices in such a project.

We have thus given our views at length in relation to this subject. From the fact that the cause was submitted without argument upon a mere reference to authorities we may not have met satisfactorily all the views which the counsel for the plaintiff in error would have taken of the case, but we can conceive of no course of reasoning which would have justified a different decision.

The judgment below will therefore be affirmed.