JOHN R. THOMPSON CO., Inc. v. DISTRICT OF COLUMBIA.

DISTRICT OF COLUMBIA v. JOHN R. THOMPSON CO., Inc.

Nos. 11039, 11044.

United States Court of Appeals District of Columbia Circuit.

Decided Jan. 22, 1953.

Writ of Certiorari Granted April 6, 1953. See 73 S.Ct. 784.

Ringgold Hart, Washington, D. C., John J. Wilson and Jo V. Morgan, Jr., Washington, D. C., on the brief), for John R. Thompson Co., Inc., appellant in No. 11039 and appellee in No. 11044.

Chester H. Gray, Principal Assistant Corporation Counsel for the District of Columbia, Vernon E. West, Corporation Counsel, Edward A. Beard, Assistant Corporation Counsel, and Clark F. King, Assistant Corporation Counsel, on the brief, for the District of Columbia, appellee in No. 11039 and appellant in No. 11044.

Phineas Indritz and S. Walter Shine, Washington, D. C., by special leave of Court, for American Civil Liberties Union, Inc., et al., amici curiae.

Philip B. Perlman, Solicitor General, Washington, D. C., filed a brief on behalf of the United States of America as amicus curiae, urging the validity of the Equal Service Acts of 1872 and 1873.

James A. Cobb, Harry C. Lamberton and Joseph Forer, Washington, D. C., filed a brief on behalf of the District of Columbia Chapter, National Lawyers Guild, as amicus curiae, urging the validity of the Equal Service Acts of 1872 and 1873.

Margaret A. Haywood, Washington, D. C., filed a brief on behalf of A. Powell Davies, et al., as amici curiae, urging the validity of the Equal Service Acts of 1872 and 1873.

Phineas Indritz and George Bunn, Washington, D. C., filed a brief on behalf of the American Veterans Committee, Inc., as amicus curiae, urging the validity of the Equal Service Acts of 1872 and 1873.

Before STEPHENS, Chief Judge, and EDGERTON, CLARK, WILBUR K. MILLER, PRETTYMAN, PROCTOR, BAZELON, FAHY and WASHINGTON, Circuit Judges.

Chief Judge STEPHENS announced the judgment of the court and an opinion in which Circuit Judge CLARK, Circuit Judge

MILLER and Circuit Judge PROCTOR concurred, and in the result of which Circuit Judge PRETTYMAN concurred.

By the Act of February 21, 1871, 16 Stat. 419, c. LXII, the Congress created a Legislative Assembly for the District of Columbia, consisting of a Council and a House of Delegates, the council to be appointed by the President, with the advice and consent of the Senate, the House of Delegates to be elected by the male citizens of the United States resident in the District.[1] The Assembly existed only until June 20, 1874, when, by the Organic Act of that date, 18 Stat. 116, it was disestablished. By an Act of June 20, 1872, D.C.Laws 1871–72, pt. IV, c. LI, § 3, Comp.St.1894, c. 16, § 150, the Assembly made it a misdemeanor for any restaurant keeper to refuse to serve any respectable well-behaved person, without regard to race, color or previous condition of servitude. The enactment provided that upon conviction of the offense defined a restaurant keeper should be fined one hundred dollars and should forfeit his license for one year. The text of the enactment, so far as here pertinent, is set forth in the margin.[2] A further enactment with similar objective and sanction was passed by the Assembly on June 26, 1873, D.C.Laws 1873, pt. II, c. XLVI, §§ 3 and 4, Comp.St.1894, c. 16, §§ 153, 154. The text of that enactment, so far as here pertinent, is also set forth in the margin.[3]

1. Sections 5 and 7 of the Act particularized the manner of appointment and election and the qualifications of the members of the Council and the House of Delegates and the qualifications of voters.

2. Sec. 3 provided: That any restaurant keeper or proprietor, any hotel keeper or proprietor, proprietors or keepers of ice-cream saloons or places where soda-water is kept for sale, or keepers of barber shops and bathing houses, refusing to sell or wait upon any respectable well-behaved person, without regard to race, color, or previous condition of servitude, or any restaurant, hotel, ice-cream saloon or soda fountain, barber shop or bathing-house keepers, or proprietors, who refuse under any pretext to serve any well-behaved, respectable person, in the same room, and at the same prices as other well-behaved and respectable persons are served, shall be deemed guilty of a misdemeanor, and upon conviction in a court having jurisdiction, shall be fined one hundred dollars, and shall forfeit his or her license as keeper or owner of a restaurant, hotel, ice-cream saloon, or soda fountain, as the case may be, and it shall not be lawful for the Register or any officer of the District of Columbia to issue a license to any person or persons, or to their agent or agents, who shall have forfeited their license under the provisions of this act, until a period of one year shall have elapsed after such forfeiture.

3. Sec. 3 provided: That the proprietor or proprietors, keeper or keepers, of any licensed restaurant, eating-house, bar-room, sample-room, ice-cream saloon, or soda-fountain room shall sell at and for the usual or common prices charged by him, her, or them, as contained in said printed cards or papers, any article or thing kept for sale by him, her, or them to any well-behaved and respectable person or persons who may desire the same, or any part or parts thereof, and serve the same to such person or persons in the same room or rooms in which any other well-behaved person or persons may be served or allowed to eat or drink in said place or establishment: . . .

Sec. 4 provided: That if the proprietor or proprietors, keeper or keepers, of any place or establishment, as aforesaid, . . . shall refuse or neglect, in person or by his, her, or their employé or agent, directly or indirectly, to accommodate any well-behaved and respectable person as aforesaid in his, her, or their restaurant, eating-house, bar-room, sample-room, ice-cream room, or soda-fountain room, or shall refuse or neglect to sell at the common and usual prices aforesaid in and at his, her, or their restaurant, eating-house, bar-room, sample-room, ice-cream saloon, or soda-fountain room, to any such person or persons therein at said prices, any article or thing kept therein and in the room or rooms in which such articles or things are ordinarily sold and served or allowed to be eaten or drank, or shall at any time or in any way or manner, or under any circumstances, or for any reason, cause, or pretext, fail, decline, object, or refuse to treat any person or persons aforesaid as any other well-behaved and respectable person or persons are treated at said restaurant, eating house, bar-room, sample-room, ice-cream saloon, or soda-fountain room, he, she, or they, on conviction of a disregard or violation of any provision, regulation, or requirement

On August 1, 1950, the Corporation Counsel for the District of Columbia filed in the Municipal Court for the District an information charging the John R. Thompson Co., Inc., as a restaurant keeper in the District, with violation of the enactments of 1872 and 1873—by refusal of service, solely because they were members of the negro race, to named well-behaved and respectable persons. The information was in four counts, the first charging violation of the enactment of 1872, the second, third and fourth with violation of the enactment of 1873. The Municipal Court, acting *sua sponte*, entered an order quashing the information upon the ground that both enactments had been repealed by the Organic Act of June 11, 1878, 20 Stat. 102. The District took an appeal from that order to the Municipal Court of Appeals, 81 A.2d 249. That court, as to the first count of the information, affirmed the order of the Municipal Court, Judge Hood being of the view that both the 1872 and 1873 enactments were invalid as beyond the power of the Assembly, Judge Clagett thinking that the 1872 enactment was repealed by the enactment of 1873. As to the second, third and fourth counts of the information, the Municipal Court of Appeals reversed the order of the Municipal Court, Judge Clagett being of opinion that the 1873 enactment was valid when enacted and that it had never been repealed, Chief Judge Cayton being of the view that both the 1872 and 1873 enactments were valid when enacted and that neither of them had been repealed. The Thompson Company petitioned this court for the allowance of an appeal from the judgment of the Municipal Court of Appeals in so far as it reversed the order of the Municipal Court quashing the information as to the second, third and fourth counts. The District,

on its part, petitioned for the allowance of a cross-appeal from the judgment of the Municipal Court of Appeals in so far as it affirmed the order of the Municipal Court in quashing the information as to the first count. We granted both petitions, and ordered the appeal and the cross-appeal heard in banc.

As the appeals stand before this court on the record and briefs they present two principal questions: The first, were the enactments of the Legislative Assembly of 1872 and 1873 on which the information against the Thompson Company was based within the power of the Assembly; the second, were those enactments repealed.

## I.

Were the enactments of 1872 and 1873 within the power of the Legislative Assembly? We think the answer to that question lies in certain constitutional provisions and principles and in certain rulings and reasoning of the Supreme Court and of this court and of its predecessor, the Supreme Court of the District of Columbia in General Term, which we shall briefly review.

The Constitution in Article I, Section 8, Clause 17, endows Congress with power "To exercise exclusive Legislation in all Cases whatsoever, over such District. . . . as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States . . .." The Act of February 21, 1871, creating the Legislative Assembly for the District of Columbia, provided in Section 1:

That all that part of the territory of the United States included within the limits of the District of Columbia be, and the same is hereby, created into a government by the name of the District of Columbia, by which name it is hereby constituted a body corporate for municipal purposes, and may contract and be con-

of this act or any part of this act contained, be fined one hundred dollars, and forfeit his, her, or their license; and it shall not be lawful for any officer of the District to issue a license to any person or persons, or their agent or agents, whose license may be forfeited under the provisions of this act for one year after such forfeiture: Provided, That the provisions of this act shall be enforced by

information in the Police Court of the District of Columbia, filed on behalf thereof by its proper attorney or attorneys, subject to appeal to the Criminal Court of the District of Columbia in the same manner as is now or may be hereafter provided for the enforcement of the District fines and penalties under ordinances and law.

tracted with, sue and be sued, plead and be impleaded, have a seal, and exercise all other powers of a municipal corporation not inconsistent with the Constitution and laws of the United States and the provisions of this act.

In Section 5 the Act provided, *inter alia:*

That legislative power and authority in said District shall be vested in a legislative assembly as hereinafter provided.

In Section 18 the Act provided:

That the legislative power of the District shall extend to all rightful subjects of legislation within said District, consistent with the Constitution of the United States and the provisions of this act, subject, nevertheless, to all the restrictions and limitations imposed upon States by the tenth section of the first article of the Constitution of the United States; but all acts of the legislative assembly shall at all times be subject to repeal or modification by the Congress of the United States, and nothing herein shall be construed to deprive Congress of the power of legislation over said District in as ample manner as if this law had not been enacted.

In December 1888, there was submitted to the Supreme Court of the United States a case which for the first time in that Court questioned the power of the Legislative Assembly, to wit, Stoutenburgh v. Hennick, 129 U.S. 141, 9 S.Ct. 256, 32 L.Ed. 637, decided in January 1889. The Assembly, by an Act of August 23, 1871, amended June 20, 1872, forbade "commercial agents"— persons whose business it is, as agent, to offer for sale goods, wares or merchandise solely by sample, catalogue or otherwise— to engage in that business in the District of Columbia without having first obtained a license to do so. An agent of a Baltimore, Maryland, merchandise firm was convicted in the District of a violation of that enactment and was sentenced to a fine and, in default of payment of the same, to the workhouse. In a habeas corpus proceeding he attacked the validity of the enactment upon which the conviction rested upon the ground that, as applied to persons soliciting in the District the sale of goods on behalf of those doing business outside of the District, it was a regulation of interstate commerce and hence within the exclusive power of Congress. The decision of the Supreme Court in the case is important here because of a distinction made and the reason given therefor. The Court, speaking through Chief Justice Fuller, said:

It is a cardinal principle of our system of government, that local affairs shall be managed by local authorities, and general affairs by the central authority, and hence, while the rule is also fundamental that the power to make laws cannot be delegated, the creation of municipalities exercising local self-government has never been held to trench upon that rule. Such legislation is not regarded as a transfer of general legislative power, but rather as the grant of the authority to prescribe local regulations, according to immemorial practice, subject of course to the interposition of the superior in cases of necessity.

Congress has express power 'to exercise exclusive legislation in all cases whatsoever' over the District of Columbia, thus possessing the combined powers of a general and of a State government in all cases where legislation is possible. But as the repository of the legislative power of the United States, Congress in creating the District of Columbia 'a body corporate for municipal purposes' could only authorize it to exercise municipal powers, and this is all that Congress attempted to do. [129 U.S. at page 147, 9 S.Ct. at page 257]

Applying the foregoing, the Court said that while the enactment of the Assembly had manifestly been regarded as a regulation of a purely municipal character, it could not be so treated because it was, as applied to the defendant, a regulation of interstate commerce; it was therefore void. The Court concluded:

In our judgment Congress, for the reasons given, could not have delegated the power to enact the 3d clause of the 21st section of the act of assembly, construed to include business agents such as Hennick, and there is nothing in this record to justify the assumption that it endeavored to do so, for the powers granted to the District were municipal merely . . . . [129 U.S. at page 149, 9 S.Ct. at page 258]

In a second case in the Supreme Court, Metropolitan Railroad v. District of Columbia, 132 U.S. 1, 10 S.Ct. 19, 33 L.Ed. 231 (1889), the question, in a suit brought by the District to recover from the Railroad moneys expended by the former in paving construction which was allegedly the statutory duty of the Railroad, was whether the District was a municipal body and as such subject to the running of the statute of limitations, or a sovereign, or, as the District contended, of such sovereign character or so identified with or representative of the sovereignty of the United States as to be entitled to the prerogatives and exemptions of sovereignty. In deciding that the District was subject to the statute of limita-

tions, the Supreme Court, in an opinion by Mr. Justice Bradley, reasoned as follows:

. . . All municipal governments are but agencies of the superior power of the State or government by which they are constituted, and are invested with only such subordinate powers of local legislation and control as the superior legislature sees fit to confer upon them. The form of those agencies and the mode of appointing officials to execute them are matters of legislative discretion. . . . It is undoubtedly true that the District of Columbia is a separate political community in a certain sense, and in that sense may be called a State; but the sovereign power of this qualified State is not lodged in the corporation of the District of Columbia, but in the government of the United States. Its supreme legislative body is Congress. The subordinate legislative powers of a municipal character which have been or may be lodged in the city corporations, or in the District corporation, do not make those bodies sovereign. Crimes committed in the District are not crimes against the District, but against the United States. Therefore, whilst the District may, in a sense, be called a State, it is such in a very qualified sense. [132 U.S. at pages 8–9, 10 S.Ct. at page 22]

Turning to the decisions of this court and of its predecessor: In District of Columbia v. Saville, 1 MacArthur's Reports 581 (1874), an information charged violation of an Act of the Legislative Assembly of June 23, 1873 "to regulate shows and exhibitions in the sale and disposal of seats." The Act, upon pain of a fine, forbade the proprietors of theatres from selling tickets, after the opening of an exhibition, so as to reserve particular seats not reserved by the sale of tickets previous to the opening. The information was quashed by the Supreme Court of the District in General Term upon the ground that the enactment was beyond the power of the Assembly. The court said:

The provisions of the act are attempted to be justified on the ground that it is a mere police regulation, and as such, within the competence of the late legislative assembly to enact. We are all of the opinion that the act has nothing whatever of the character of a police regulation, but on the contrary that it is an unwise, vexatious and unlawful interference with the rights of private property. [1 MacArthur's Reports at page 584]

In Roach v. Van Riswick, MacArthur and Mackey's Reports 171 (1879), there was presented to the Supreme Court of the District in General Term the question whether or not an Act of the Legislative Assembly of August 2, 1871, making judgments a lien on equitable interests in land, was within the power of the Assembly. In an opinion from which, for full understanding, we must quote at some length, the court ruled that it was not. The court said:

Among the other powers conferred by the Constitution, is the power to 'exercise *exclusive* legislation in all cases whatsoever over such district, not exceeding ten miles square, as may, by cession of particular States, and the acceptance of Congress, become the seat of the Government of the United States.'
It may be admitted that the term 'exclusive' has reference to the States, and simply imports *their* exclusion from legislative control of the District, and does not necessarily exclude the idea of legislation by some authority subordinate to that of Congress and created by it. For enlightenment on this latter subject, we must look to those general principles in regard to the nature of legislative power which seem to be recognized by the authorities.
In this country, where the principles of constitutional law are better understood than elsewhere, it seems perfectly established that the power conferred by a constitution on a legislative body, to make laws, cannot be delegated by that body to any other body or authority, but is regarded as a kind of personal trust reposed in the legislators, the mode of whose election is supposed to contain guaranties of their judgment, wisdom and patriotism.

*  *  *  *

But this fundamental rule, which forbids the delegation of legislative power, is subject to a qualification. It is admitted, that even without any express constitutional authority, a legislature may create municipal corporations with certain powers of local government. According to the spirit of our institutions, the regulation of local concerns in a town, is considered as properly belonging to its inhabitants, and not properly the subject of general legislation; and it is hardly looked upon as a delegation of *legislative* authority, properly so-called, to confer this power of regulation on local boards, assemblies, or other inferior officers. It is rather the grant of a power to pass by-laws. Legislative authority for *corporate* action is of course necessary, and it is always subject to legislative revision and control. But municipal regulation of the internal economy of a town, is universally recognized as something distinct from the exercise of legislation, which is invested by the constitution of a State in its legislature, and cannot be delegated. Cooley Con. Lim., 191. [MacArthur and Mackey's Reports at pages 174–176]

The court then pointed out that while "it is difficult to draw the line between powers that are strictly municipal, and may rightly be conferred on local corporations, and those which are properly legislative and

cannot be delegated . . . this difficulty does not disprove the existence of 'such a dividing line." The court then said:

Notwithstanding the difficulty of laying down general rules, there are some subjects to which we can, with reasonable certainty, assign their proper place, as between the State and the municipality. Thus, universal usage and legislation recognize the preservation of public order, morals and health, the regulation of markets and places of amusement, the inspection of provisions, the improvement and repair of streets, and, as an incident to the others, the levying of general taxes and special assessments, as appropriate powers of a municipality.

On the other hand, titles to property, its transfer and transmission, the form and effect of judicial proceedings, the formalities and effect of contracts, the law of commercial papers, the whole subject of crimes and other subjects of equally general interest, one would naturally assign to the highest legislative authority in a State.

There might be twenty municipalities in one State. Each might have its own powers and its own mode of exercising them, as to the subjects which I have mentioned, as proper to be handled by it. But it is apparent, that the second class of subjects that I have mentioned, should be dealt with by laws operating uniformly through a State. It would never do to have different rules of property, different laws of contract generally, or of commercial papers in particular, different legal proceedings and remedies, and different criminal codes in the different municipalities of a State. It is very plain that the disposition of these subjects by law is the exercise of legislative power, and that, when that is constitutionally vested in a definite legislative body, it cannot, in the nature of things, be delegated to another. The power of making laws derived directly from the people is legislative; the power of local regulation derived from the legislature is municipal, no matter how limited or extensive the locality embraced by it.

These conclusions will apply to the Congress of the United States, even if we regard it as a mere local legislature, in its relations with the District of Columbia. When it assumed jurisdiction over the District, it found two corporations, Alexandria and Georgetown, in existence, and a few years later it created a third, the city of Washington. Each one of those corporations had a charter, and all the charters differed more or less in detail, while the general features of municipal charters were common to all. It would have been preposterous for Congress to have committed to each the power of regulating or ordaining legal proceedings and remedies, establishing the law of contracts, &c., within their respective corporate limits. Three or four different systems of law would have prevailed, the creatures of municipal action; and great confusion and perhaps conflict would have prevailed. Each one of these was essentially a municipal corporation, exercising derivative powers of local regulation, and if they had been all consolidated, it is not perceived that their essential character would have been changed.

But there are still more important considerations influencing this question.

Congress is not a *local* legislature in reference to this District but it legislates for this District in its character as a national legislature.

* * * *

Judge Marshall said: 'In the enumeration of the powers of Congress, which is made in the 8th section of the 1st article, we find that of exercising exclusive legislation over such District, &c., &c. This power, like all others which are specified, is conferred on Congress *as the legislature of the Union,* for strip them of that character and they would not possess it. In no other character can it be exercised. In legislating for the District, they necessarily preserve the character of the legislature of the Union, for it is in that character alone that the Constitution confers on them this power of exclusive legislation. This proposition need not be enforced,' &c., &c.

It is matter of history that the legislation of Congress respecting the internal affairs of the District has in various instances had direct reference to the interests of the people of the States. Thus, non-resident executors and administrators from the States, by act of 1812, were allowed to sue and recover claims in the courts of the District. So, at a later date, it is a matter of private history, that the arrest for debt, here, of a visitor from a State, was the occasion of the abolition by Congress of imprisonment for debt. Other illustrations might be given showing that in practice, as well as theory, the legislation of Congress, for this District, is the exercise of one of the powers conferred on it, as the national legislature.

If this be so, then this power is to be viewed in the same light as the other powers conferred on Congress, viz., those of regulating commerce, borrowing money on the credit of the United States, coining money, &c., &c.

Now, if we suppose Congress to have conferred on the corporation of Washington, or any other municipal body here, the power to regulate commerce between the northern and southern States, in its transit through the District, as by levying tolls on transportation of persons and freight; or of establishing a mint and coining money, &c., we would at once see how glaring an abdication and transfer of its proper functions Congress would be guilty of. The same might be said if Congress had authorized the corporation of Washington to legislate for the District of Columbia. But according to what has been shown, it would be none the less such for Congress to delegate to a municipality of its own creation the power of general legislation, expressly confided to it by the Constitution over this District, including, as in this case, the power to regulate the practice of the courts of the United States here and to determine the effect of their judgments, and thus change the common law of titles derived by us from Maryland, which could only be changed by an act of legislation of the most authoritative character. [MacArthur and Mackey's Reports at pages 178–181]

The Court had been referred in the argument of the case to the laws establishing

governments in the territories as an example of the delegation of its legislative authority by the Congress which had received the sanction of judicial authority. But the Court concluded that that was not a pertinent subject, saying:

*Non nostrum est tantas componere lites,* but until it can be considered as settled, that the 'power to dispose of and make all needful rules and regulations respecting the territory, *or other property* belonging to the United States,' is identical with the power to exercise exclusive legislation over such District as may become the seat of government, the practice of Congress in regard to the territorial government furnishes us no authoritative guide in the interpretation of the clause relating to the District of Columbia. [MacArthur and Mackey's Reports at pages 182–183]

Finally the Court ruled:

Our conclusion, on the whole, is, that the act of the District legislature declaring judgments rendered by this court to be liens on equitable interests in land, was an act of legislation which it was only competent for the Congress of the United States to pass, and was in itself totally inoperative and void, and the decree rendered by the court below must be reversed. [MacArthur and Mackey's Reports at page 187]

In Cooper v. District of Columbia, MacArthur and Mackey's Reports 250 (1880), the enactment of the Legislative Assembly of August 23, 1871, amended June 20, 1872, which was under consideration in Stoutenburgh v. Hennick, supra, in its application to persons soliciting in the District the sale of goods on behalf of those doing business outside of the District, was held within the rightful power of the Assembly in so far as it required produce dealers to take out a license. The Supreme Court of the District in General Term characterized Roach v. Van Riswick, supra, as follows:

. . . All that was decided there was that Congress had no right to bestow upon the legislative assembly of the District any powers which were not necessary for it *as a municipality;* but the decision expressly, in more than one place, declares that whatever was granted by Congress to the legislative assembly of the District, in respect to matters properly pertaining to municipal government, was a valid grant. [MacArthur and Mackey's Reports at page 251]

In Smith v. Olcott, 19 App.D.C. 61 (1901), the validity of the enactment of the Legislative Assembly of August 23, 1871, amended June 20, 1872, was again in question, in that instance in respect of a provision fixing absolute fees and commissions for auctioneers in sales of real or personal property. The enactment was relied upon in justification of an item in a trustee's account for auctioneer's charges for a sale of real estate under a trust deed. This Court of Appeals held the enactment invalid. The court said:

Congress has express power 'to exercise exclusive legislation in all cases whatsoever,' over the District of Columbia, thus possessing the combined powers of a general and of a State government in all cases where legislation is possible. But as the repository of the legislative power of the United States, Congress in creating the District of Columbia 'a body corporate for municipal purposes,' could only authorize it to exercise municipal powers.

Applying this rule to the clause of the section, above quoted, we are of the opinion that its enactment was beyond the power conferred upon the District assembly.

It is not a mere local regulation within the scope of the powers ordinarily delegated to municipal corporations, but an attempt at the exercise of a general legislative power over the freedom of contracts.

It is essentially different from the power exercised in other parts of the act in the matter of regulating the occupation of auctioneers, and laying a license tax upon the same.

It also differs from those enactments, frequently made by municipal bodies under special delegations of power, which regulate the charges, by fixing a maximum rate, of all persons engaged in certain particular callings, as for example, hackmen who make special use of the public streets and places in the pursuit of their regular calling.

It will be observed that the regulation in question does not undertake to fix a maximum rate of charges for auctioneers, leaving parties free to contract for less if they see proper, but undertakes to prescribe one absolute, invariable charge for all sales of real estate. In this respect it resembles an act prescribing the fees of public officers, for official services compulsorily rendered, and which, as a matter of sound public policy, are not permitted to become the subject of special contract. [19 App.D.C. at page 75]

In Coughlin v. District of Columbia, 25 App.D.C. 251 (1905), a Joint Resolution of Congress of February 26, 1892, 27 Stat. 394, empowered the Commissioners of the District "to make and enforce all such reasonable and usual police regulations in addition to those already made under the act of January twenty-sixth, eighteen hundred and eighty-seven, as they may deem necessary for the protection of lives, limbs, health, comfort and quiet of all persons and the protection of all property within

the District of Columbia. . . . ." This was held not to justify a regulation promulgated by the Commissioners (the regulation was stated to have been copied from an old municipal ordinance of the City of Washington) requiring the owners or occupants of buildings or land fronting upon a paved sidewalk in the District to remove snow and ice therefrom. This court said:

. . . it is regulation, not legislation, that is authorized; the reasonable regulation of the exercise of right, not the imposition of a duty; the usual police regulation for the maintenance of public order, not the levying of a tax either in the way of enforced labor or in the way of purchase of materials for sprinkling the sidewalks. Whatever power the legislature itself may have in the premises, certainly it is not to be presumed to have granted such plenary authority as is here claimed under the joint resolution of 1892.

That various municipalities may have exercised such power, as appears from various municipal ordinances collated in the brief on behalf of the appellee, is not to the point. Municipalities are usually vested with quasi legislative powers, among them the sovereign power of taxation and assessment, and from the fact that municipal ordinances are elsewhere to be found, analogous to the so-called regulation here in question, it is not to be inferred that similar powers exist in the commissioners of the District of Columbia. The commissioners are not the municipality, but only the executive organs of it; and Congress has reserved to itself, not only the power of legislation in the strict sense of the term, which it cannot constitutionally delegate to anyone or to any body of men, but even the power of enacting municipal ordinances, such as are within the ordinary scope of the authority of incorporated municipalities. It has delegated to the commissioners simply the power of making 'police regulations,' and only such police regulations as are usual and commonly known by that designation. [25 App.D.C. at pages 254–255]

The decision was in part rested upon the ground that the Congress, on three occasions, had itself expressly legislated, although ineffectually, on the precise subject of the questioned regulation. That, the court said, was sufficient to show that the Congress had reserved this subject for itself and did not confer upon the Commissioners the power to regulate it. The court said:

. . . Instead of an application to Congress there has been this ill-advised resurrection of an old municipal ordinance, and the promulgation of it by the commissioners as a regulation of their own, intended to effect what three several acts of Congress had failed to effect. We cannot but regard it as a plain usurpation of the powers of Congress. [25 App.D.C. at page 257]

In United States ex rel. Daly v. MacFarland, 28 App.D.C. 552 (1907), it appeared that under an Act of April 23, 1892, 27 Stat. 21, and an Act of March 3, 1893, 27 Stat. 537, the Congress had extended to the Commissioners of the District power to make plumbing regulations, and had provided that violation of such regulations should be punishable by fine or, in default of payment thereof, by imprisonment. The Commissioners promulgated regulations, but included therein an additional penalty for violation, to wit, the revocation of a plumber's license. Acting under the regulations thus promulgated, the Commissioners forfeited a license. In a mandamus proceeding to compel restoration of the same, this court held that it was not within the power of the Commissioners to provide the additional penalty. The court said:

It is well settled that the District of Columbia has no legislative power, it being merely a municipal corporation bearing the same relation to Congress that a city does to the legislature of the State in which it is incorporated. [Citing authorities]

The next proposition is equally established, namely, that 'a *municipal corporation possesses and can exercise the following powers, and no others:* First, those granted in *express words;* second, those *necessarily or fairly implied* in or *incident* to the powers expressly granted; third, those essential to the declared objects and purposes of the corporation,—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied.' Dill. Mun. Corp. 4th ed. Sec. 89.

\* \* \* \*

. . . The constitutional guaranties of the liberty and property of the individual undoubtedly include and protect him in the exercise of his right to earn his living by following a lawful calling, and this right is subject only to reasonable control. That such a license as was revoked in this case is a species of property goes without saying. The right to forfeit this property by the revocation of the license must clearly appear, or it must be held not to exist. Judge Dillon says (sec. 345):

'A corporation, under a general power to make by-laws, cannot make a by-law ordaining a forfeiture of property. To warrant the exercise of such an extraordinary authority by a local and limited jurisdiction, the rule is reasonably adopted that it must be *plainly,* if not, indeed, *expressly* conferred by the legislature.'

Certainly such power will not be presumed to exist in statutes in restraint of the ordinary and legitimate avocations of life, avocations in which the mass of human toilers gain their livelihood and contribute to the welfare and happiness of society. In Greater New York

Athletic Club v. Wurster, supra, [19 Misc. 443, 43 N.Y.S. 705] the court held that a grant of power to abridge and curtail the exercise of the right of the individual to engage in or pursue a business or calling lawful in itself can only be justified and sustained on the theory that the exercise of such power is necessary to the public welfare and safety, and such power cannot be presumed, but must be clearly expressed. [28 App.D.C. at pages 558–562]

In Johnson v. District of Columbia, 30 App.D.C. 520 (1908), this court ruled that Sections 1 and 2 of the Act of August 23, 1871, of the Legislative Assembly, prescribing a jail penalty or fine, or both, for cruelty to animals were mere police regulation. The court said:

We think it clear that the two sections of the Act above referred to . . . are mere police regulation, and therefore within the scope of powers delegated to the municipality by Congress. Stoutenburgh v. Hennick, 129 U. S. 141, 32 L.Ed. 637, 9 Sup.Ct.Rep. 256; Smith v. Olcott, 19 App.D.C. 61. Cruel treatment of helpless animals at once arouses the sympathy and indignation of every person possessed of human instincts,—sympathy for the helpless creature abused, and indignation towards the perpetrator of the act; and in a city, where such treatment would be witnessed by many, legislation like that in question is in the interest of peace and order and conduces to the morals and general welfare of the community. 'Laws for the prevention of cruelty to animals may well be regarded as an exercise of such police powers. That good government calls for the condemnation of such acts as are prohibited by the ordinance ought not to be questioned. The subject is pre-eminently one for local municipal regulation.' St. Louis v. Schoenbusch, 95 Mo. 618, 8 S.W. 791, [30 App. D.C. at page 522] ·

In United States v. Cella, 37 App.D.C. 433 (1911), there was involved an indictment charging violation of an Act of March 1, 1909, 35 Stat. 670, which prohibited bucketing and bucket shopping and abolished bucket shops. The prosecution was in the name of the United States. It was contended by the defendant that it should have been in the name of the District of Columbia, this in view of Section 932 of Chapter 20 of the Code, 31 Stat. 1340, relating to criminal procedure and providing that:

Prosecutions for violation of all police or municipal ordinances or regulations, and for violation of all penal statutes in the nature of police or municipal regulations, where the maximum punishment is a fine only, or imprisonment not exceeding one year, shall be conducted in the name of the District of Columbia and by the city solicitor or his assistants. All other criminal prosecutions shall be conducted in the name of the United States and by the attorney of the United States for the District of Columbia or his assistants.

The decision of this court turned upon the question whether or not the bucket shop act was a police or municipal ordinance or regulation or a penal statute in the nature of a police or municipal regulation, or whether it created and denounced a general offense. In holding that it did the latter, the court said:

We have said in the prior case that there can be no crimes against the District of Columbia, the District not being a sovereignty; that crimes committed here are crimes against the United States. Metropolitan R. Co. v. District of Columbia, 132 U.S. 1, 33 L.Ed. 231, 10 Sup.Ct.Rep. 9[19]. Congress, in the exercise of its plenary power, has prescribed the procedure to be followed in the prosecution of offenses in the District. It has ordained that prosecutions for violations of all police or municipal ordinances or regulations, and penal statutes 'in the nature of police or municipal regulations,' shall be in the name of the District. It is at once apparent, therefore, that the point raised by appellees is purely technical in character, as no substantial right is involved.

Looking to the context, and having in mind the probable intent of Congress, what is the scope of the words 'penal statutes in the nature of police or municipal regulations,' as used in the statute under consideration? A municipal ordinance or police regulation is peculiarly applicable to the inhabitants of a particular place; in other words, it is local in character. While municipal ordinances or police regulations are binding upon the community affected by them, they do not emanate from the supreme power of the state, which is the exclusive source of all general legislation. Baldwin v. Philadelphia, 99 Pa. 170; Rutherford v. Swink, 96 Tenn. 564, 35 S.W. 554. When, therefore, Congress required prosecutions for violations of statutes in the nature of police or municipal regulations to be in the name of the District of Columbia, it undoubtedly had in mind such local regulations as were peculiarly applicable to conditions here existing. It did not, we think, intend to require or permit prosecutions under general penal statutes to be in the name of the District of Columbia, even though the territorial scope of such statutes was restricted to the District. A statute making it an offense for a motor vehicle to exceed a certain limit of speed within the city limits would clearly be a penal statute in the nature of a police regulation. Such a statute would be designed to regulate the speed of motor vehicles in accordance with the requirements of local conditions. The bucket shop statute under consideration, however, is of a different character. We find that statute in the chapter of the Code devoted to crimes and punishments, and in a sub-chapter governing offenses against public policy. The commission of the offense would be as much against public policy in one place as in another; in other words, while

the statute is local in its application, it deals with a subject-matter general in character. Admittedly, a prosecution for a second offense under the act must be in the name of the United States, since the punishment for such an offense may be imprisonment for five years. No reason is apparent why a prosecution for a first offense should not also be in the name of the United States. Moreover this statute does not purport to regulate the business of bucketing, but, on the contrary, is designed absolutely to prohibit it. While the authority to enact such a statute may be ascribed to the police power, as indeed may be the authority to enact all criminal statutes, we think, nevertheless, that the act is something more than one in the nature of a police or municipal regulation; that it creates and denounces a general offense, and hence that prosecution thereunder was rightly commenced in the name of the United States. [37 App.D.C. at pages 435–436]

It is correctly suggested in Roach v. Van Riswick, that, for lack of a precise criterion, the determination of what powers are strictly "municipal" and may therefore rightly be conferred upon local corporations, and what powers are properly "legislative" and cannot therefore be delegated, is not always without difficulty. But we think that the constitutional provisions and principles and the rulings and reasoning above reviewed—which for this court are authoritative—clearly require the conclusion that the enactments of the Legislative Assembly of 1872 and 1873 which are under question in the instant case were of the character of "general legislation," the power to enact which the Congress could not constitutionally, and did not, delegate to the Legislative Assembly.

In requiring restaurant keepers, upon pain of fine and license forfeiture, to serve any respectable, well-behaved person without regard to race, color, or previous condition of servitude, the enactments limit the freedom of the restaurant keeper in the use of his property, in the exercise of his power to contract, and in the carrying on of a lawful calling. Before the enactments, he could choose customers according to his own business or personal desire. The enactments lift restaurant keeping, theretofore strictly a private enterprise, to the level of a "public employment" —thereby altering the common law, which required inns, but not restaurants, to serve all travellers. Alpaugh v. Wolverton, 184 Va. 943, 36 S.E.2d 906 (1946); Nance v. Mayflower Tavern, 106 Utah 517, 150 P. 2d 773 (1944); Beale, Innkeepers and Hotels, 1906, §§ 15, 35, 53, 61, 301; Williston, Contracts (Rev.Ed. v. 4, § 1066, pp. 2964, 2965); 43 C.J.S., Innkeepers, § 2, p. 1136.[4]

---

4. In Alpaugh v. Wolverton the plaintiff Alpaugh's notice of motion for judgment alleged in a first count that the defendant Wolverton, as the owner and operator of a hotel and restaurant, had unlawfully refused restaurant service to the plaintiff on named days of the week on which the defendant had agreed to serve members of a Chamber of Commerce, including the plaintiff; and alleged in a second count that the defendant had unlawfully refused restaurant service to the plaintiff on named days of the week on which the defendant had agreed to serve members of a Kiwanis Club, including the plaintiff. The Circuit Court, Prince William County, sustained a demurrer which challenged the sufficiency of the notice of motion. That ruling was affirmed by the Supreme Court of Appeals of Virginia. That court recognized that the proprietor of a hotel may be an "innkeeper" as to some of his patrons and a "boardinghouse keeper" as to others. The court ruled:

"Once the technical relation of innkeeper or hotelkeeper and guest has been established, the parties become subject to the duties, responsibilities and liabilities which attach to the relationship. Because of the *quasi* public nature of his business, the innkeeper must furnish proper accommodations in the way of lodging, food, etc., so far as they are available (43 C.J.S., Innkeepers, § 9, p. 1149). He becomes 'practically an insurer of the safety of property intrusted to his care' by the guest (28 Am.Jur., Innkeepers, section 67, p. 585), and he incurs other responsibilities which need not be detailed here. In return, he has a lien on the property of his guest for the reasonable charges of such keep and entertainment, both at common law (28 Am.Jur., Innkeepers, section 123, p. 624) and under our statute (Code, section 6444).

"A restaurant, on the other hand, is an establishment where meals and refreshments are served. 28 Am.Jur., Innkeepers, section 10, p. 545; 43 C.J.S., Innkeepers, section 1, b, p. 1132.

"The proprietor of a restaurant is not subject to the same duties and responsibilities as those of an innkeeper, nor is he entitled to the privileges of the latter. 28 Am.Jur., Innkeepers, section 120,

The enactments do not relate, in the usual sense of the terms, "to the promotion or protection of the public morals and decency, the securing of the public safety against fires, explosions, riot or disorder, or other dangers to life and limb, the preservation of the public peace and order, the furtherance of sanitation and the safeguarding of the public health" which are the ordinary subjects of municipal regulation.[5] Moreover, the essential object of the enactments was to prevent in restaurants—and in the other businesses enumerated—discrimination on account of race, color, or previous condition of servitude, notwithstanding that such discrimination was customary in the District of Columbia at the time the enactments were promulgated.[6] The enactments are in the nature of civil rights legislation. They undertake to establish in the restaurant business, and in the other businesses named, a policy of equal service without respect to race or color, and to enforce that policy by a fine and license forfeiture. Finally, the enactments, though applicable only in the District of Columbia, are, because they are applicable in the Nation's capital, of national interest. In view of the purpose and effect of the enactments as above described, we think that no other conclusion can reasonably be reached than that they were of the character of general legislation, the power to enact which the Congress could not constitutionally delegate to the Assembly.

We think also that in the Act of February 21, 1871, creating the District government and the Legislative Assembly, the Congress did not attempt to endow the Assembly with power to enact such measures as are the subject of the instant appeals. The Congress made no express grant of power to the Assembly to enact such measures, and in our view such power is not fairly or necessarily to be inferred from the powers granted in the Act, and the power to enact such measures was not indispensable to the carrying out of the corporate objects of the District of Columbia as those objects appear from the Act.

We are referred to the so-called "Jim Crow Cases": Boyer v. Garrett, 183 F. 2d 582 (4 Cir., 1950); Bunn v. City of Atlanta, 67 Ga.App. 147, 19 S.E.2d 553 (1942); Housing Authority of City of Dallas v. Higginbotham (Tex.Civ.App.) 143 S.W.2d 95 (1940); Hopkins v. City of Richmond, 117 Va. 629, 86 S.E. 139 (1915) overruled on constitutional grounds, other than delegability, in Irvine v. City of Clifton Forge, 124 Va. 781, 97 S.E. 310(1918); Patterson v. Taylor, 51 Fla. 275, 40 So. 493 (1906); Crooms v. Schad, 51 Fla. 168, 40 So. 497 (1906); Mayo v. James, 12

---

p. 623; 43 C.J.S., Innkeepers, section 20, b, p. 1169. His rights and responsibilities are more like those of a shopkeeper. Davidson v. Chinese Republic Restaurant Co., 201 Mich. 389, 167 N.W. 967, 969, L. R.A.1918E, 704. He is under no common-law duty to serve everyone who applies to him. In the absence of statute, he may accept some customers and reject others on purely personal grounds. Nance v. Mayflower Tavern, [106] (Utah) [517], 150 P.2d 773, 776; Noble v. Higgins, 95 Misc. 328; 158 N.Y.S. 867, 868." [184 Va. at pages 947–948, 36 S.E.2d at page 908]

5. The quoted language is from McQuillin, Municipal Corporations, 3rd ed., v. 7, § 21.198, p. 15.

6. Of such a historical fact the court may properly take judicial notice. Cf. Blake v. United States, 103 U.S. 227, 235, 26 L.Ed. 462, 465 (1880); Commonwealth ex rel. John Ferguson v. Ball, 277 Pa. 301, 306, 121 A. 191, 192, 29 A.L.R. 626, 629 (1923). See Stultz v. Cousins, 242 F. 794, 798 (6 Cir., 1917). 9 Wigmore, Evidence, 3d ed. (1940), 571; 20 Am.Jur. 82.

It is such common historical knowledge that there was general discrimination on account of color at the time the enactments in question in the instant case were passed that citation of historical authorities on the subject is superfluous. But see: Speeches of Senator Charles Sumner of Massachusetts, Cong. Globe, 42nd Cong., 2nd Sess. 381–389, 429–435 (1871–1872). In reference to the District of Columbia itself see: W. B. Bryan, A History of the National Capitol, vol. II (N.Y., 1916), 529–531; Edward Ingle, The Negro in the District of Columbia (Baltimore, 1893), 57; Washington, D. C. Evening Star, Jan. 9, 1872, p. 4, col. 1.

Grat. 17 (Va.) (1855); Roberts v. City of Boston, 5 Cush. (Mass.) 198 (1849). Those cases uphold as within the bounds of municipal power ordinances requiring segregation of the white and colored races: For example, in Patterson v. Taylor, an ordinance requiring separate accommodation for, and the separation of white and colored passengers on, streetcars; in Hopkins v. City of Richmond, ordinances requiring residential segregation for members of the white and colored races; in Boyer v. Garrett, an ordinance for the segregation of races in athletic activities in public parks and playgrounds. We think such cases distinguishable from the instant case because in such cases the ordinances were in accord with a local custom of racial segregation on account of color and were held valid upon the theory that they were for the purpose of preserving peace and good order which would likely be interfered with by racial association. Ordinances in aid of the preservation of peace and order are indisputably within municipal power. The enactments involved in the instant case were in conflict with local custom in respect of race association and cannot therefore be justified as in aid of the preservation of peace and order. Moreover the cases cited are not authoritative in this jurisdiction.

The brief for the District of Columbia refers to certain Acts of Congress and to certain enactments of various municipal authorities in the District of Columbia prior to the Legislative Assembly enactments of 1872 and 1873 which are in question in the instant case. We describe in the margin the prior Acts and enactments referred to.[7]

7. The Act of Congress of May 3, 1802, 2 Stat. 195, vesting the first government of the City of Washington with authority to regulate liquor dealers and to restrain and prohibit gambling.

The enactment of December 15, 1810, of the 9th Council of the City of Washington, prohibiting the keepers of ordinaries and taverns from selling spirituous liquors to any slave or other person of color on Sundays after 9:00 o'clock in the forenoon.

The Act of Congress of May 15, 1820, 3 Stat. 583, authorizing the City of Washington to regulate taverns, ordinaries and tippling houses and reenacting the authorization of May 3, 1802, to restrain and prohibit gambling.

The Act of Congress of May 17, 1848, 9 Stat. 223, continuing in force for a period of 20 years, or until Congress should by law determine otherwise, the Act of Congress of May 15, 1820, and the Act of Congress of May 26, 1824, 4 Stat. 75, incorporating the inhabitants of the City of Washington, and certain Acts supplemental or additional to such Acts.

The enactment of June 3, 1853, of the 50th Council of the City of Washington, prohibiting keepers of ordinaries or taverns from selling spirituous liquors to any slave or other person of color on any day between sunset and sunrise, and prohibiting such keepers from selling any spirituous liquors on Sunday.

The Act of Congress of June 12, 1860, 12 Stat. 29, reorganizing the government of the County of Washington and authorizing the Levy Court to license taverns and hotels in that part of the District beyond the city limits.

The enactment of October 31, 1864, of the 62nd Council of the City of Washington, prohibiting keepers of hotels, taverns, ordinaries and restaurants from selling spirituous and fermented liquors to any minor and from selling any kind of liquors on Sunday.

The enactment of June 10, 1869, of the 66th Council of the City of Washington, making it unlawful for any person licensed for the purpose of giving a lecture, concert, exhibition, circus performance, theatrical entertainment or for conducting a place of public amusement of any kind, to make any distinction on account of race or color as regards admission, provided that any person applying should pay the regular prices and conduct himself in an orderly and peaceful manner.

The enactment of March 7, 1870, of the 67th Council of the City of Washington, making it unlawful for the keepers of any licensed hotel, tavern, restaurant, ordinary, sample room, tippling house, saloon, or eating house to refuse to admit, entertain and supply any quiet and orderly person or to exclude any person on account of race or color.

The Act of Congress of February 21, 1871, 16 Stat. 419, creating the Legislative Assembly and providing that all laws and ordinances of the cities of Washington and Georgetown, whose charters were repealed, and of the Levy Court, which was abolished, not inconsistent with the Act itself, should remain in full force

The District contends that they evidence that the Congress regarded such enactments of the municipal authorities, including the enactment of March 7, 1870 of the 67th Council of the City of Washington—which the enactments of 1872 and 1873 of the Legislative Assembly substantially paralleled—as within the proper power of the municipal authorities. We think this contention not correct, especially in view of the fact that in Section 1 of the Act of February 21, 1871, creating the District Government and the Legislative Assembly, the Congress provided that the District Government should, *inter alia,* "exercise all other powers of a municipal corporation *not inconsistent with the Constitution and laws of the United States and the provisions of this Act.*" (Emphasis supplied.) But assuming that the Congress did regard the municipal enactments in question as within municipal power, that is not decisive of the question as to their validity. That question must be determined by the courts. We are referred to no judicial decision upholding, as within the power of the municipal authorities of the District, the enactments referred to.

## II.

The conclusion reached in the previous topic that the enactments of the Legislative Assembly of 1872 and 1873 are of the character of general legislation requires the further conclusion that they were repealed by the District of Columbia Code of 1901, Act of March 3, 1901, 31 Stat. 1189. Section 1 of that Code provided that:

> The common law, all British statutes in force in Maryland on the twenty-seventh day of February, eighteen hundred and one, the principles of equity and admiralty, all general acts of Congress not locally inapplicable in the District of Columbia, and all acts of Congress by their terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, in force at the date of the passage of this act shall remain in
>
> force except in so far as the same are inconsistent with, or are replaced by, some provision of this code.

That section did not expressly preserve enactments of the Legislative Assembly. Such enactments were, however, dealt with by § 1636 of the Code which provided:

> All acts and parts of acts of the general assembly of the State of Maryland general and permanent in their nature, all like acts and parts of acts of the legislative assembly of the District of Columbia, and all like acts and parts of acts of Congress applying solely to the District of Columbia in force in said District on the day of the passage of this act are hereby repealed, except: * * *

That was an express repeal of all enactments of the Legislative Assembly not saved from repeal by eight exceptions which were expressly set forth in the Section. The only exceptions pertinent to the present inquiry are the Third and the Fifth. The Third exception named:

> Acts and parts of acts relating to the organization of the District government, or to its obligations, or the powers or duties of the Commissioners of the District of Columbia, or their subordinates or employees, or to police regulations, and generally all acts and parts of acts relating to municipal affairs only, including those regulating the charges of public-service corporations.

That exception did not save the Assembly enactments of 1872 and 1873 for the reason that those enactments, as we have demonstrated in the previous topic, were not acts in the nature of police regulations, or acts relating to municipal affairs only; and those enactments obviously are not within the other acts and parts of acts mentioned in the Third exception. The Fifth exception saved from repeal:

> All penal statutes authorizing punishment by fine only or by imprisonment not exceeding one year, or both.

As indicated at the outset of this opinion, the enactments of the Assembly of 1872 and 1873 provide that upon conviction of the offenses defined a restaurant keeper

> until modified or repealed by Congress or the Legislative Assembly.
>
> The enactment of August 23, 1871 of the Legislative Assembly requiring the proprietors of restaurants and eating houses to pay an annual tax and providing that every place, the business of which is to provide meals and refreshments for casual visitors, should be re-

> garded as a restaurant or eating house, and further providing that all laws and ordinances of the corporations of Washington and Georgetown, and of the Levy Court, promulgating police regulations for the several businesses of the citizens of the District should be continued in force.

shall be fined one hundred dollars and also forfeit his license. If the forfeiture provisions are in the nature of a penalty rather than being merely remedial, then the enactments were not saved by the Fifth exception because they were not within the class of penal statutes which that Section expressly saved. We think it clear that the license forfeiture provisions of the enactments of 1872 and 1873 are in the nature of penalties. The 1872 enactment makes violation a misdemeanor; the 1873 enactment provides for enforcement by information filed in the Police Court of the District of Columbia, subject to appeal to the Criminal Court of the District in the same manner as provided for the enforcement "of the District fines and penalties under ordinances and law." The license forfeiture provisions are an integral part of those sanctions.

### III.

According to the "Agreed Statement of Facts" filed in the Municipal Court in the instant case:

There is no official record of any attempted prosecutions for violations of the terms of the Legislative Assembly Act of June 20, 1872; . . . upon information and belief there were four such prosecutions, all resulting in convictions in the Police Court but all being reversed in the Supreme Court of the District of Columbia, holding criminal court, or resulted in *nolle pros;* all four such prosecutions were in the year 1872 and there have been no further attempted prosecutions under the 1872 Act since that year.
. . . [T]here is no official record of any attempted prosecutions under the terms of the Legislative Act of June 26, 1873, and, so far as can be learned, there was never an attempt of prosecution under that Act.

The 1873 enactment required, in addition to the serving of any well-behaved and respectable person, the transmission to the "Register of said District" of "a printed copy of the usual or common price or prices of articles or things kept for sale by him . . . which shall be filed by the Register . . . and in a failure of any proprietor . . . to transmit the copy aforesaid, the said Register shall notify such person of such failure, and require such copy to be forthwith transmitted to him." According to the "Agreed Statement of Facts":

. . . the records of the District of Columbia fail to show that any local restaurant or eating house ever filed with the Assessor [sic] for the District of Columbia a printed or other copy of its usual or common prices of articles kept by it for sale, as required by the Act of June 26, 1873, and, so far as is known, no demands were ever made upon local restaurants so to file by the Assessor [sic] or other municipal officer.

The Thompson Company asserts that the failure of the municipal authorities to enforce the Assembly enactments of 1872 and 1873 constitutes an administrative interpretation that the enactments were not in force and effect, and urges that the enactments have been repealed by this "long course of administrative interpretation or by obsolescence."

In view of the conclusion we reach in Topics I and II of this opinion—that the enactments were not within the power of the Assembly and that they were repealed by the 1901 Code, we think it not necessary to rule upon these additional contentions. But we think it appropriate to comment, in this connection, that the enactments having lain unenforced for 78 years, in the face of a custom of race disassociation in the District, the decision of the municipal authorities to enforce them now, by the prosecution of the instant case, was, in effect, a decision legislative in character. That is to say, it was a determination that the enactments reflect a social policy which is now correct, although it was not correct —else the enactments would have been enforced—heretofore. Such a decision were better left, we think, to the Congress. And in ruling that the enactments of 1872 and 1873 cannot, because not within the power of the Assembly, and because repealed, support the present prosecution, this court rules upon the question of their validity alone and not upon the question of the wisdom of the policy which they reflect. That question is not within the proper province of either the municipal authorities or the courts; it is for Congressional determination.

In accordance with the conclusions we reach that the enactments in question in the instant case were not within the power of the Legislative Assembly and that they

were repealed, and in view of Circuit Judge PRETTYMAN'S view expressed in his separate opinion that if the enactments were general legislation they were invalid when enacted and were repealed, that if they were municipal ordinances regulatory of licensed businesses they are now unenforceable:

The judgment of the Municipal Court of Appeals as to the first count of the information is affirmed, and as to the second, third and fourth counts of the information is reversed.

PRETTYMAN, Circuit Judge, concurring in the judgment announced by Chief Judge STEPHENS.

The question upon these appeals is whether an information charging the restaurant owner, Thompson Company, Inc., with violation of certain 1872 and 1873 acts of the Legislative Assembly can validly be prosecuted. The nature of those enactments constitutes the initial premise from which any course of reasoning toward a conclusion must proceed. There are two possible views. Either they were general legislation, e. g., relating to civil rights, use of property, validity of contracts, or similar subjects; or they were municipal ordinances regulatory of licensed businesses.

It is my opinion that upon proper reasoning from either view the conclusion is reached that the enactments are presently unenforceable.

The Judges who join Chief Judge STEPHENS take the former view. There are reasons, which he describes, which support that view. From that premise I think the next steps in his opinion follow inevitably. If the enactments constituted legislation they were invalid when enacted by the Legislative Assembly, being beyond the power permitted a municipal body in the District of Columbia by the Constitution; and, furthermore, even if valid when enacted they were repealed by the express provision of the 1901 Code.

The judges who join Judge FAHY take the other view of the nature of the enactments. They would hold that the enactments are regulatory municipal ordinances. There are reasons, which Judge FAHY describes, which support that view. But it seems to me that, if that premise be adopted, the same ultimate conclusion, that the enactments are presently unenforceable, must follow.

We must keep in mind that when we consider the enactments from this latter viewpoint we are considering acts of a municipal authority, not acts of Congress; regulatory ordinances, not statutes; acts of an official body having power to repeal or abandon these regulations, not of a body without such power. It seems to me that a regulatory condition imposed upon a business license, originally prescribed by a municipal licensing authority in 1872 and 1873 but neither mentioned again nor enforced for a period of 75 years, despite the interim promulgation of apparently complete regulations and the issuance of thousands of licenses during that period, must be deemed by the courts to have been abandoned by the licensing authority.

No prosecution under these enactments has been attempted since 1872. No mention of them has been made by any official since 1873. No official text or record of their passage exists, the text and record with which we are dealing being gleaned from unofficial compilations, newspapers, and such.* Congress has passed licensing acts several times since 1873, general acts

---

* After these cases were decided, on January 22, 1953, and the opinions promulgated, the Corporation Counsel for the District of Columbia advised the court that the signed originals of these enactments had been discovered since the argument and are in the possession of the Commissioners of the District in a bound volume. He states that this volume was recently discovered in a storage room in the basement of the District Building, which is the official home of the District Government. He has exhibited these originals to the court and to counsel in the cases. Prior to the discovery of the original documents the text of the enactments was found in Abert and Lovejoy's Compiled Statutes (1894) (see D.C. Code X (1951)) and in the District of Columbia Laws published by authority of Edwin L. Stanton, Secretary of the District of Columbia. The existence of the enact-

in 1902[1] and 1932,[2] and an act giving the Commissioners power to prescribe regulations for the sale of alcoholic beverages, an important part of many restaurant businesses, under licenses.[3] The latter contained many regulatory provisions and authorized the Commissioners to prescribe others. The enactments of 1872 and 1873 applied to barrooms as well as to restaurants. Extended regulations for the operation of restaurants have been promulgated at least once by the Commissioners; in 1942 the Commissioners published an order which began: "That for the purpose of regulating the establishment, maintenance and operation of restaurants, delicatessens and catering establishments in the District of Columbia, the following regulations are hereby adopted: * * *." In none of the statutes or regulations adopted since 1873 have the regulations with which we are here concerned been mentioned or referred to. In fact the existence of any such regulation was unknown to the licensing authorities for many years, probably half a century. In all this period of time restaurants in this jurisdiction have exercised a power to select their customers. A rapidly increasing number have served all well-behaved persons, but it is not represented to us that any of them thought this policy obligatory. Many have limited their clientele.

I am fully aware of the principle, often stated, that a statute is not repealed by disuse and also that the doctrine of desuetude, recognized and applied in the Scottish law, had no place in the English common law.[4] But that principle (that a statute lives in full force despite nonuse) rests upon the proposition that the executive branch of government cannot nullify an act of the legislative branch by failure to enforce, any more than it can effect a repeal by direct fiat. Our present consideration does not involve that proposition. Since 1878 the Board of Commissioners has been the governing body of the District of Columbia,[5] which is a municipal corporation.[6] They have had the power both to make[7] and to enforce[8] municipal regulations and generally to exercise all the usual powers of a municipal corporation.[9] Theirs have been the powers of local ordinance-making and of law enforcement.[10] They could repeal what they could enact. Thus the failure to restate and to enforce the 1872–73 conditions was by an official body which had power to do just that. Executive disuse of a legislative enactment is not involved. What is involved is disuse by a licensing authority of its own regulations.

If a municipal licensing authority should say, "Hereafter operations of licensed restaurants shall be subject to the following regulations: (a), (b), (c) and (d)," and a few years later should say, "Hereafter operations of licensed restaurants shall be subject to the following regulations: (a), (b) and (c)," no one would contend, I should think, that a restaurant operator could be prosecuted for failure to observe regulation (d) after the latter announcement. It seems to me that regulation (d)

ments and their text having been conceded by all parties, and the cases having been decided upon that basis, the discovery of the originals does not affect the gist of the opinions.

1. Act of July 1, 1902, 32 Stat. 622; as to "victualers * * * or eating houses, by whatsoever name designated," see 32 Stat. 625, D.C.Code § 20–887 (1929).

2. Act of July 1, 1932, 47 Stat. 550; as to restaurants see 47 Stat. 554, D.C.Code § 47–2327 (1940); as to regulations see 47 Stat. 563, D.C.Code § 47–2345 (1940).

3. Act of Jan. 24, 1934, 48 Stat. 322, D.C. Code § 25–107 (1940).

4. Philip, Some Reflections on Desuetude, 43 Jurid.Rev. 260 (1931).

5. 20 Stat. 103 (1878), as amended, D.C. Code § 1–201 (1951).

6. Rev.Stat.D.C. § 2 (1874), 18 Stat. part. 2, § 2, D.C.Code § 1–102 (1951).

7. 27 Stat. 394 (1892), D.C.Code § 1–226 (1951). Since 1902 they have had specific power to require licenses for businesses or callings. 32 Stat. 622 (1902), as amended, D.C.Code § 47–2344 (1951).

8. Rev.Stat.D.C. § 3 (1874), 18 Stat. part 2, § 3, 18 Stat. 116 (1874), 20 Stat. 103 (1878), D.C.Code § 1–218 (1951).

9. Supra note 6.

10. Baltimore & Ohio Railroad Co. v. District of Columbia, 1897, 10 App.D.C. 111, 125.

would be deemed by the courts to have been abandoned for the later period. It makes no difference whether the result be labeled abandonment, desuetude, repeal by implication, or whatsoever. Quite the contrary, if regulation (d) had been imposed by Congress, it would remain enforceable until repealed by Congress, whether the municipal licensing authority ever mentioned it or not. The point is that a municipal body can abandon its own once-announced regulations, but it cannot nullify an act of its superior legislature.

Although irrelevant to the issue at hand, before leaving this phase of the discussion I note that the principle of non-repeal of statutes by disuse has some exceptions. For example, see the opinion of Chief Justice Tilghman of the Supreme Court of Pennsylvania in Wright v. Crane;[11] and the opinion of that court in Porter's Appeals;[12] and the English cases cited by Chancellor Bland of Maryland in Snowden v. Snowden;[13] and the long, vigorous opinion of the Supreme Court of Iowa in Hill v. Smith;[14] and the long discussion, in which the Supreme Court of Pennsylvania held the ducking stool to be no longer an available means of punishment, in James v. Commonwealth;[15] and the implication in the observation of this court in 1902 that "we cannot regard any act of Congress as obsolete which has been enacted as late as 1874."[16] There are, of course, many other cases to the contrary, and in some of these same jurisdictions, but the discussions above cited show that courts have sometimes refused to apply long-disused statutes even though they were unrepealed acts of the legislature.

These 1872–73 enactments were not quiescent provisions applicable once in a while to some peculiar occasion. The licensing authorities have issued hundreds of licenses to restaurants every year for these 75 years, and except for the period of prohibition also to liquor dispensers. They must have purported to advise the licensees, and the licensees must have understood or thought they understood, the conditions upon which they were to conduct their licensed businesses. As each business license has been issued over all these years, these regulations have been ignored. Moreover, these were regulations which would have governed the daily conduct of every licensee. If they were applicable at all, they were applicable constantly to many businesses. Thus the failure to apply them has been active, affirmative, constant and consistent.

Consider the provision, included in these enactments, that the proprietor of a soda fountain must transmit to the Assessor (or Register) of the District a printed copy of the usual prices of articles kept for sale. The regulatory authority in 1873 announced that failure to abide that requirement would result in the forfeiture of the license for a period of not less than one year. The records fail to show that any copy of a sales price was ever filed with the Assessor. They fail to show that any demand for filing was ever made upon any licensee by any municipal authority. It is not conceivable to me that the District authorities could now successfully prosecute criminally a soda fountain operator for failing to file his prices with the Assessor. It is not enough for us, a court, to say that we deem the service provisions desirable and the filing provisions inconsequential, however true that may be. Our question is not one of policy. It is a naked question of law: Is the regulation presently enforceable? It relates to the regulation as a regulation, not merely to parts we may select as desirable.

I think a court would not enforce a condition which was imposed upon a business licensee secretly by the licensing authority and not revealed either to the public or to the licensee. We would surely hold such procedure not to be due process of law. The case before us is not essentially different, and in some respects is stronger, from the standpoint of the licensee. The condi-

11. 1825, 13 Serg. & R. 446, 452.

12. 1858, 30 Pa. 496, 499.

13. 1829, 1 Bland. 550, 555

14. 1840, Morris 70.

15. 1824, 12 Serg. & R. 220.

16. Costello v. Palmer, 20 App.D.C. 210, 220.

tion here involved was not only not revealed by the licensing authority when the license was issued but was not at that time intended to be imposed upon this license; indeed, as I have noted, the licensing authority was not then even aware of such a condition. The circuitous revival of long-dead conditions, after this license was outstanding, was as unjustifiable as a secret adoption of the condition would have been. The due process of law problem which would be raised by an affirmative executive attempt to impose conditions upon established businesses and properties is not presented upon this record, but it hovers in the background.

I do not attempt to draw the line at which, or to depict the circumstances under which, a regulatory condition announced once by a municipal licensing authority and thereafter totally ignored by it, in issuing both regulations and licenses, and in enforcing regulatory measures, becomes ineffective. There must be some time and some circumstance under which continued non-mention of a municipal regulatory condition prevents the licensing authority from enforcing forfeiture of a license for failure to observe that condition. Here we have seventy-five years of disuse in the face of several enactments of licensing acts by Congress, promulgation of extensive regulations by the municipal authorities, issuance of thousands of licenses, and the daily conduct of many licensed businesses. If there be such a thing as a combination of time and circumstances which spell the abandonment of a regulation by the municipal authority which once promulgated it, this is it.

What is said about forfeiture applies to criminal prosecution. Both provisions are in the same sentence of the same enactment. The forfeiture follows automatically a conviction for the criminal offense. And what applies to filing price lists applies also to the provision, in the same enactments, for service to all well-behaved persons.

If the regulation before us were one of any of the government administrative agencies and all the circumstances were the same as those shown in the present case, we would not hesitate, I think, to hold that a criminal proceeding would not lie.

Citing other cases and quoting from one, the Supreme Court, in Lanzetta v. State of New Jersey,[17] phrased, unanimously, an established rule: "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." The Court there held invalid a statute as vague, uncertain and indefinite. A fortiori a penal provision unknown to either government authority or licensee is not enforceable.

One of Bentham's observations is very apt:

"We hear of tyrants, and those cruel ones: but, whatever we may have felt, we have never heard of any tyrant in such sort cruel, as to punish men for disobedience to laws or orders which he had kept them from the knowledge of."[18]

I think it not amiss to test our thought by assuming a reverse content in the enactments. Suppose they had required segregation in restaurants, that they were so-called "Jim Crow" ordinances such as seem to have existed in some cities. Suppose that since their enactment in 1873 they had never been applied or even mentioned, and that since that date all restaurants had served whom they pleased and many pleased to serve all well-behaved persons. Suppose that the municipal authorities in 1950 suddenly charged one such restaurant with violating the old ordinance, and subjected the licensee to a criminal proceeding which would result also in a forfeiture of license. Would this court hold the forgotten regulation applicable? I am certain it would not. And the legal question in that situation would be the same as that now before us. We are not to determine what the law ought to be. That is for the Congress, not for the courts. It is not for this or any other court, however strong and clear its opinion on the subject may be, to determine

17. 1939, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888.

18. 5 Bentham, Works 547 (1843).

what the law ought to be concerning service to customers in licensed restaurants. The judicial branch of government cannot impose either segregation or non-segregation upon licensed restaurants. The only question presented by the present case within the scope of judicial power is the simple question whether these 1872–73 enactments of the Legislative Assembly are presently enforceable against this appellant in a criminal proceeding with its mandatory license forfeiture upon conviction. That question would be the same, I suggest, if the content of the enactments were the reverse of their actual content. The answer ought to be the same.

Avoiding the dilemma in which I find the case, the dissenting judges cast the 1872–73 enactments outside the area of either legislation or license condition, a little of each but wholly neither. But their position in that regard seems to me most insecure. They say, first, that the Legislative Assembly was a legislative body. But, of course, it could not be a true legislative body. Under the Constitution the Congress is, and can be, the only legislative body for the District of Columbia. The Assembly was legislative in the sense that the word applies to the adoption of municipal ordinances, and in that sense alone. So solution of the problem whether the enactments of 1872–73 were legislation in a general sense or were municipal regulatory ordinances is not advanced in the least by saying that the Assembly was a "legislative" body. Second, the dissenting judges say the 1872–73 enactments were not conditions imposed upon licensed businesses. They liken those enactments to municipal ordinances such as the off-roof snow removal regulation, the fireproof drapery regulation, and other regulations of that sort. Those, they say, apply to licensed businesses but are not conditions upon the licenses; they are merely regulatory requirements. The first regulation they mention, the snow removal one,[19] begins "No person shall throw", etc. It covers "any street, avenue", etc., and "coal, * * * mud, * * * offal, * * * or

any dead animal" as well as snow. The other police regulation to which they refer,[20] the fireproof drapery requirement, begins: "That the draperies, and readily combustible decorations of booths and the like to be used in any church", etc. No activity is farther removed from licensing than is the conduct of a church. Those regulations do apply to licensed businesses in the same sense that they apply to all businesses, and all people, and all activities. The off-roof snow requirement applies to every operation, licensed or not, housed in structures from which snow falls off the roofs. The fireproof drapery requirement is imposed upon every entertainment, licensed or not. The same is true of the other regulations the dissenting judges mention, those relating to minimum wages, maximum prices, and child labor. Those regulations are not conditions imposed upon licenses; they are police regulations imposed upon everybody. No forfeiture of license is a prescribed penalty for their violation. But a regulation imposed upon a designated business which is operated under a license, and upon such a business only, for violation of which regulation forfeiture of the license is decreed, is a condition upon operation under the license; call it what we will. These enactments of 1872–73, whether they be general legislation or merely municipal ordinances, are clearly conditions imposed upon the conduct of named licensed businesses and upon no other activity or person, and one compulsory penalty for violation is a forfeiture of the license.

One further thought on this phase of the discussion. Even if these enactments were not correctly described as conditions upon operations under certain licenses, but were general regulatory municipal ordinances, it seems to me that they could be abandoned by the municipal authority which had the combined powers to repeal them or to enforce them, and that the sum of the circumstances shown in this case demonstrates effective abandonment.

I concur in the judgment announced by Chief Judge STEPHENS. But I think it

19. Police Regulations of the District of Columbia, Art. III, § 1 (1944).

20. Id., Art. XVII, § 2.

unnecessary for the court to determine whether the enactments were legislation or were regulatory municipal ordinances. The same ultimate result—that they are presently unenforceable—follows in either event. If they were general legislation they were void from the beginning and in any event were repealed by the 1901 Code. If they were municipal ordinances they were long ago abandoned by the regulatory authority which originally adopted them. Thus a determination as to which view of the nature of the enactments is correct is immaterial to the controversy before us, which controversy is simply whether Thompson Company can be presently prosecuted for failure to observe them. That being so, I think the court should not attempt to make a firm decision upon the disputed original nature of the enactments. We ought to explore all premises and all courses of reasoning applicable to them, but if they all lead to the same result in the controversy we have to decide, we need not choose one route only. We are well advised not to limit the result we reach to a single premise if in fact we think all admissible premises establish that result. In such latter event we ought to say just that; we ought not in effect to qualify our conclusion.

I am authorized to state that Circuit Judge WILBUR K. MILLER concurs in the opinion of Chief Judge STEPHENS, but if the view that the enactments are regulatory ordinances were accepted, he agrees with what is said in this opinion.

FAHY, Circuit Judge, with whom EDGERTON, BAZELON and WASHINGTON, Circuit Judges, concur, dissenting:

In our view the provisions of the 1873 Act requiring the proprietor of a licensed restaurant to serve any well-behaved and respectable person were valid when enacted

by the Legislative Assembly, have not been repealed and are in effect.[1] Such problems as may now arise from their enforcement can be met in a reasonable manner without judicial repudiation of regulations legally enacted and never repealed.

I. We first give our reasons for concluding the equal service provisions were valid when enacted.

Art. I, Sec. 8, Cl. 17, of the Constitution confers upon Congress exclusive legislative power over the District of Columbia.[2] Under this grant subordinate instrumentalities of government have from time to time been created by Congress. The Legislative Assembly[3] was one of these, with authority granted by Congress over

"* * * all rightful subjects of legislation within said District, consistent with the Constitution of the United States and the provisions of this act * * * but all acts of the legislative assembly shall at all times be subject to repeal or modification by the Congress of the United States, and nothing herein shall be construed to deprive Congress of the power of legislation over said District in as ample manner as if this law had not been enacted." Section 18.

There can be no doubt the passage of the equal service provisions was within this grant. They deal with "rightful subjects of legislation", their scope is "within said District," they are "consistent with the Constitution of the United States",—a Constitution framed in the background of the principle that all men are created equal. They have at all times been subject to repeal or modification by Congress.

There can be no question Congress could constitutionally delegate to the Legislative Assembly power to enact regulations of a municipal or local character. No judge of

---

1. Since they are in substitution for provisions enacted in 1872, the latter, with regard to restaurants, are repealed. This is adequately explained in the opinion of Judge Clagett in the Municipal Court of Appeals. District of Columbia v. John R. Thompson Co., 1951, 81 A.2d 249, 262.

2. "The Congress shall have Power * * * To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government * * *."

3. Act of February 21, 1871, 16 Stat. 419, D.C.Code (1951), Historical, p. XLV et seq.

any of the three courts which have considered this case has indicated doubt about this. And the Supreme Court, in Stoutenburgh v. Hennick, 1889, 129 U.S. 141, 147, 9 S.Ct. 256, 257, 32 L.Ed. 637, while striking down an attempt by the Legislative Assembly to regulate interstate commerce, said:

> "It is a cardinal principle of our system of government, that local affairs shall be managed by local authorities, and general affairs by the central authority, and hence, while the rule is also fundamental that the power to make laws cannot be delegated, the creation of municipalities exercising local self-government has never been held to trench upon that rule. * * *"

If, therefore, enactment of the equal service provisions was "local self-government" they are valid. We think this is the case. They regulate a local activity, the serving of food at a fixed location within the District. This is the sort of thing which in the several states, unless there is state-wide law to the contrary, is appropriately left to municipal authority. This is so not merely because the law applies only to a local area; it is local by other standards as well. Such a regulation is one which the immediate governing body of a municipality, a city council for example, is likely to make its own concern. Higher authority, either a state legislature or, as here, Congress, may legislate upon the subject, but until it does local initiative may deal with it in accordance with the local point of view as to what is conducive to the peace, order, morals, or welfare of the community.

Under this approach it seems plain the equal service provisions must be considered municipal or local. They represent the views of the Legislative Assembly as to how this matter should be regulated within the District of Columbia. They do not affect the general criminal law, or the descent or other disposition of property, or domestic relations, or the law of contracts or of torts, or interstate commerce, or any other matter commonly regulated by general law, but the serving of persons in licensed eating places in the local community. There is no necessity that eating places should be subject to identical regulations in all the cities of any one state. To hold that a municipality is not competent to regulate the subject would create a serious gap in the power of a community to govern itself in a matter of local concern.

Communities vary in outlook and in the same community outlook changes with time and experience. This is as true of segregation as of many subjects. All regulation in this field should not be impossible because the sort of consensus that leads to state legislation is lacking. We find this view widely held by city governments throughout the country. There are many local ordinances which require segregation on account of race or color and many others which prohibit discrimination on such basis. Birmingham,[4] San Francisco,[5] New York City,[6] Cleveland[7] and Philadelphia[8] have ordinances on the subject in respect to housing. Ordinances requiring separation of the races in public transportation are to be found in Birmingham,[9] Mobile,[10] Atlanta,[11] Dallas[12] and Houston.[13] Fair employment practice ordinances ap-

---

4. Ord. No. 709–F, adopted Aug. 9, 1949 (Minute Book A–32).

5. File No. 4781 (Series of 1939), approved May 17, 1949.

6. Ch. 41, Art. I, § J41–1.2, Administrative Code of the City of New York, 1948 Cum.Supp.; Ch. 15, Title A, § 384–16.0, Administrative Code of the City of New York, 1949 Cum.Supp.

7. Ord. No. 2139–49, passed Dec. 19, 1949.

8. Ord., Authorizing cooperation among Phila. Housing Authority, City of Phila. and School District of Phila. in construc-

tion of low rent homes by the Phila. Housing Authority, § 10, approved May 19, 1950.

9. §§ 1002, 1413, General City Code (1944).

10. Ch. 20, Art. I, §§ 224–230, Code of Ordinances of the City of Mobile.

11. §§ 85–138, 85–139, Code of City of Atlanta (1942).

12. Art. 76–22, Art. 77–14, Dallas City Code (1941).

13. Art. III, §§ 2207–2216, City Code of Houston (1942).

plicable to all employers have been passed by Chicago,[14] Minneapolis,[15] Cleveland,[16] Youngstown,[17] Philadelphia [18] and Milwaukee.[19] Phoenix,[20] Richmond, California,[21] and New York City [22] have ordinances which deal with city employment. Miami Beach has an ordinance [23] prohibiting restaurants from displaying signs or other advertisements tending to discriminate because of race, color or creed. Birmingham requires segregation in restaurants,[24] gambling places,[25] pool and billiard rooms,[26] and other public places.[27] Atlanta provides for segregation in barbershops,[28] graveyards,[29] restaurants,[30] cabs,[31] baseball parks [32] and barrooms.[33] Albuquerque [34] and Cleveland [35] have ordinances, specifically applicable to restaurants, prohibiting discrimination in places of public accommodation.

Excepting Nance v. Mayflower Tavern, Inc., 1944, 106 Utah 517, 150 P.2d 773, we are referred to no case which holds any regulation either forbidding or requiring racial segregation to be invalid merely because enacted by municipal authority. Factual distinctions may be drawn as to some of these ordinances—some deal with municipal projects for example, not with private enterprises—but each is a product of munici-

pal government. Furthermore, each concerns racial segregation. This widespread governmental practice, though not conclusive, is strongly persuasive, especially as there is no rule of thumb by which to determine whether a regulation is local or constitutes general legislation beyond municipal competence. We see no reason to cast doubt upon the regulations with which we are concerned, and the many similar ones with which we are not concerned, on the sole ground that they owe their existence to local authority; or to say that those which require segregation are, if constitutional, valid when enacted by such authority while those which seek to ameliorate discrimination are not.

History in this very District adds further persuasion. So far as we are informed the term "restaurant" first appeared in municipal regulations in Washington in 1864 when the Council of the City of Washington prohibited the keepers of restaurants, hotels, taverns and ordinaries from selling certain liquors to minors or on Sunday.[36] The forerunners of these places were the ordinaries or taverns mentioned in the regulations of 1810,[37] prohibiting the sale of named liq-

14. Ch. 198.7A, §§ 1–6, Municipal Code of Chicago.

15. Ord., To prohibit discriminatory practices in employment, etc., §§ 1–10, passed Jan. 31, 1947.

16. Ord. No. 1579–48, passed Jan. 30, 1950, to supplement Municipal Code of Cleveland (1924) with new §§ 2999–2 to 2999–9.

17. Ord. No. 51948, Defining and prohibiting unfair employment practices, §§ 1–6, approved May 16, 1950.

18. Ord., Prohibiting discrimination in employment because of race, color, etc., §§ 1–9, approved Mar. 12, 1948.

19. Ord. No. 22, To create §§ 106–24—106–29 of the Milwaukee Code, relating to fair employment practices, passed May 13, 1946.

20. Ord. No. 4810, approved April 27, 1948.

21. Ord. No. 1303, passed May 16, 1949.

22. Ch. 13, Title A, § 343–8.0, Administrative Code of the City of New York.

23. Ord. No. 883, adopted June 15, 1949.

24. § 369, General City Code (1944).

25. Id. § 597.

26. Id. § 939.

27. Id. § 859.

28. § 37–129, Code of City of Atlanta (1942).

29. Id. § 42–302.

30. Id. §§ 53–603—53–605.

31. Id. § 62–121.

32. Id. § 66–1005.

33. Id. § 55–217.

34. Ord. No. 768, approved Feb. 12, 1952.

35. Ord. 1016–37, passed Nov. 26, 1934, to supplement Municipal Code of Cleveland (1924) with § 2999–1.

36. Act approved Oct. 31, 1864, Corporation Acts of Washington, Sixty-second Council, § 10, p. 11, 12 Corporation Laws of Wash., D.C. (62–65 Councils, 1863–1868) (D.C.Pub.Lib.Ref.No. + K859L, W2741).

37. Act approved Dec. 15, 1810, Corporation Acts of Washington, Ninth Council,

uors at certain times to any person of color. Similar regulations were passed by the local Council in 1853.[38] After the adoption of the Fourteenth Amendment in 1868 came the Council Ordinance of June 10, 1869, prohibiting distinction on account of race or color by persons licensed to give concerts, theatrical entertainments, or the like, provided those admitted conducted themselves in an orderly and peaceable manner and paid the regular price.[39] Then, in 1870, the Council again regulated restaurants, eating houses, taverns and the like by providing, among other things, that the keepers thereof should not refuse to admit or supply any quiet and orderly person on account of race or color.[40] When the form of government of the District was changed by the Act of February 21, 1871, supra, it was provided in Section 40 that ordinances not inconsistent with the Act should remain in full force until modified or repealed either by Congress or the Legislative Assembly of the District. The Assembly followed by its Act of August 23, 1871,[41] continuing in force such ordinances "providing police regulations for the several businesses of the citizens of the District of Columbia * * *." During this period from 1810 to 1871 the respective local legislative bodies regulated eating places, and also regulated segregation, pursuant to delegation by Congress, under whose eyes their ordinances were left in effect as municipal regulations.

The opinion of Chief Judge STEPHENS to the effect that the provisions now in question nevertheless are general legislation beyond the competence of the Legislative Assembly lacks the adherence of a majority of this court. Our four Brothers who subscribe to that view recognize that the so-called "Jim Crow Cases" upheld as within the bounds of municipal power ordinances requiring segregation. They say those ordinances accorded with local custom, that accordingly they were for the purpose of preserving peace and order, and that this brought them indisputably within municipal power. This we think erroneous. A purpose to preserve peace and order does not bring an ordinance within municipal authority. The definition and punishment of serious crimes, for example, is not within municipal authority because one of the purposes of the criminal law is to preserve peace and good order. Such a purpose is quite appropriate for municipal attention but it does not make legislation municipal. Segregation ordinances have been upheld by the courts as within authority validly delegated to municipalities. The same subject with which they deal is involved in this case. If a municipal ordinance may require segregation it may require equal treatment. And if civil rights are involved here they were also involved in the "Jim Crow Cases" and in the mass of local regulations emanating from all sections of the nation to which we have referred. There is no doctrine known to the law that validity or invalidity of legislation rests upon whether or not it conforms with prevailing custom. Such a consideration goes to the wisdom or policy of the legislation, not to its validity. Custom does play a part in judicial consideration when obsolescence is said to have impliedly repealed a law. But we are now concerned with the validity of these regulations when they were enacted and it would be a contradiction in terms to

c. 17, pp. 29-30, 1 Corporation Laws of Wash., D.C. (1–15 Councils, 1802–1818) (D.C.Pub.Lib.Ref.No. + K859L, W2741).

38. Act approved June 3, 1853, Corporation Acts of Washington, Fiftieth Council, Title 4, c. VII, § 8, p. 81, Sheahan, Washington, D.C. Laws To 1853 (D.C.Pub.Lib. Ref.No. + K859L, Sh 3.3).

39. Act approved June 10, 1869, Corporation Acts of Washington, Sixty-sixth Council, c. 36, p. 22, 13 Corporation Laws of Wash., D.C. (66–68 Councils, 1868–1871) (D.C.Pub.Lib.Ref.No. + K859L, W2741).

40. Act approved Mar. 7, 1870, Sixty-seventh Council, c. 42, p. 22, id.

41. Act approved Aug. 23, 1871, Laws of the District of Columbia 1871–1872, First Session, c. LXIX, § 24, p. 101, 1 Laws of the District of Columbia 1871–1872 (D.C. Pub.Lib.Ref.No. + K859, D634A).

say a law had been impliedly repealed because obsolete when enacted. In any event no such argument can here be made.

It is said that the cases upholding segregation ordinances are not authoritative in this jurisdiction. While they are not controlling they are judicial decisions on the subject under consideration. They are therefore more authoritative than cases decided in this jurisdiction, reviewed at length in the opinion of Judge STEPHENS, but which involved laws of an entirely different character.[42]

We need not decide whether Congress intended to grant the Legislative Assembly power to enact laws of a character more general than municipal ordinances or whether such an intent could constitutionally be carried out in this District. Extended consideration recently has been given to this latter subject by committees of Congress studying home rule legislation. It has been urged before these committees that Congress can delegate to an instrumentality of its creation in this District as much legislative authority as has been held valid when extended to territorial governments. No such question is now before us.

In another respect also we must keep the issue clear. It is whether the provisions for equal service are local or municipal in character, not whether restaurants can be regulated to the same degree as inns.[43] The regulations are unquestionably valid if they were enacted by competent authority, notwithstanding they impose some restriction upon freedom of contract and the use of property; Nebbia v. People of State of New York, supra, n. 42, at pages 523–524,

54 S.Ct. 505, and West Coast Hotel Co. v. Parrish, supra, n. 42, at pages 391–392, 57 S. Ct. 578, for restaurants, like inns and other enterprises, are subject to reasonable regulation in the public interest. Powell v. Utz, D.C.E.D.Wash., 1949, 87 F.Supp. 811; Merrill v. Hodson, 1914, 88 Conn. 314, 91 A. 533, L.R.A.1915B, 481; City of Chicago v. R. & X. Restaurant, 1938, 369 Ill. 65, 15 N.E.2d 725, 117 A.L.R.1313; Brown v. J. H. Bell Co., 1909, 146 Iowa 89, 123 N.W. 231, 124 N.W. 901, 27 L.R.A.,N.S., 407; Humburd v. Crawford, 1905, 128 Iowa 743, 105 N.W. 330; Kimmell v. Town of Westernport, 1922, 140 Md. 506, 117 A. 748; Liggett Drug Co. v. Board of License Commissioners, 1936, 296 Mass. 41, 4 N.E.2d 628; Ferguson v. Gies, 1890, 82 Mich. 358, 46 N.W. 718, 9 L.R.A. 589; Rhone v. Loomis, 1898, 74 Minn. 200, 77 N.W. 31; State v. Freeman, 1859, 38 N.H. 426; De Roos v. Chapman, 1929, 106 N.J.L. 6, 147 A. 570; Western Pa. Restaurant Ass'n v. City of Pittsburgh, 1951, 366 Pa. 374, 77 A.2d 616; Ogden City v. Leo, 1919, 54 Utah 556, 182 P. 530, 5 A.L.R. 960; and Village of St. Johnsbury v. Thompson, 1887, 59 Vt. 300, 9 A. 571.

For the reasons stated our opinion is that the equal service requirements of the Act of 1873, as applied to licensed restaurants, are regulations of a local or municipal character validly enacted by the Legislative Assembly.

II. The regulations have not been repealed. It is not intimated in the opinion either of Judge STEPHENS or of Judge PRETTYMAN that repeal has occurred in any ordinary manner if the provisions are municipal or local. But we consider cer-

42. For this reason we do not comment at length upon these decisions. Some of the cases, e.g., Roach v. Van Riswick, 1879, 1 MacArthur & M. 171, 176, 178, seem in fact to support our view that the equal service provisions of the 1873 Act were municipal regulations. Some of the cases, such as District of Columbia v. Saville, 1874, 1 MacArthur 581, and Smith v. Olcott, 1901, 19 App.D.C. 61, are of most questionable soundness in view of subsequent decisions of the Supreme Court. Nebbia v. People of State of New York, 1934, 291 U.S. 502, 525, 54 S.Ct. 505, 78

L.Ed. 940, and West Coast Hotel Co. v. Parrish, 1937, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703. See, also, Carolene Products Co. v. United States, 1944, 323 U.S. 18, 31, 65 S.Ct. 1, 89 L.Ed. 15.

43. If that were the issue the following language of Lord Mansfield, in Saunderson v. Rowles, 4 Burr. 2064, 2068, 98 Eng.Rep. 77, 79 (K.B.1767), would be pertinent: "The analogy between the two cases of an inn-keeper and a victualler is so strong that it cannot be got over."

tain contentions advanced by appellant Company in this regard.

The view of the Municipal Court that the Organic Act of June 11, 1878, 20 Stat. 102, accomplished repeal, is fully answered by Chief Judge Cayton in the Municipal Court of Appeals, as follows:

"* * * The express words of the first section of the Organic Act are that 'all laws now in force relating to the District of Columbia not inconsistent with the provisions of this Act shall remain in full force and effect.' While the 1878 Act reorganized the form of the District Government and the administration thereof, it did not by implication or otherwise repeal, supersede or supplant the whole body of pre-existing law governing the District." 81 A.2d at page 255.

It is argued that the Code of 1901, 31 Stat. 1189, 32 Stat. 520, 33 Stat. 1012, brought repeal. Quite the contrary. Insofar as here applicable the plan adopted by the Code of 1901, as set forth in Section 1636,[44] was to repeal "All acts and parts of acts of the general assembly of the State of Maryland general and permanent in their nature," and "all like acts and parts of acts of the legislative assembly of the District of Columbia * * * except" those then described. Among the latter, and therefore not repealed, are the following:

"Acts and parts of acts relating to * * * police regulations, and gen-erally all acts and parts of acts relating to municipal affairs only * * *."

Furthermore, Section 1640, 31 Stat. 1436 (1901), § 49–304, D.C.Code (1951), provides:

"Nothing in the repealing clause of this code contained shall be held to affect the operation or enforcement in the District of Columbia of the common law * * * or of any municipal ordinance or regulation, except in so far as the same may be inconsistent with, or is replaced by, some provision of this code."

As also set forth in the opinion of Judge Cayton both Congress and the courts have consistently recognized the continuing validity of acts of the Legislative Assembly unless expressly superseded. We do not repeat the numerous decisions in this jurisdiction to which he refers. 81 A.2d at pages 253–254.

We must also reject the contention that the equal service law is impliedly repealed by the General Licensing Act,[45] originally enacted in 1902, and regulations thereunder. Implied repeal is not favored. United States v. Borden Co., 1939, 308 U.S. 188, 198–199, 60 S.Ct. 182, 188, 84 L.Ed. 181.[46] To destroy the equal service provisions by implication from a general licensing law could have some support in logic or reason only if they were in a licensing law. This is not the case. They regulate in certain respects the conduct of restaurants which have been licensed under other laws.

---

44. "All acts and parts of acts of the general assembly of the State of Maryland general and permanent in their nature, all like acts and parts of acts of the legislative assembly of the District of Columbia, and all like acts and parts of acts of Congress applying solely to the District of Columbia in force in said District on the day of the passage of this act are hereby repealed, except: * * * Acts and parts of acts relating to * * * police regulations, and generally all acts and parts of acts relating to municipal affairs only, including those regulating the charges of public-service corporations." § 1636, D.C.Code (1901), 31 Stat. 1434, 1435 (1901), § 49–304, D.C.Code (1951).

45. §§ 47–2301 et seq., D.C.Code (1951).

46. In the language of Chief Justice Hughes, in the case cited,
"It is a cardinal principle of construction that repeals by implication are not favored. When there are two acts upon the same subject, the rule is to give effect to both if possible. United States v. Tynen, 11 Wall. 88, 92 [20 L.Ed. 153]; Henderson's Tobacco, 11 Wall. 652, 657 [20 L.Ed. 235]; General Motors Acceptance Corp. v. United States, 286 U.S. 49, 61, 62 [52 S.Ct. 468, 472, 76 L.Ed. 971]. The intention of the legislature to repeal 'must be clear and manifest'. Red Rock v. Henry, 106 U.S. 596, 601, 602 [1 S.Ct. 434, 439, 27 L.Ed. 251]. It is not sufficient, as was said by Mr. Justice Story in Wood v. United States, 16 Pet. 342, 362, 363 [10 L.Ed. 987], 'to establish that subsequent

We come now to the views expressed by Judge PRETTYMAN. He does not reach a conclusion whether the equal service provisions are general legislation or municipal ordinances. If they are the former he says they are invalid or repealed; if the latter he says they have been abandoned, which is another way of saying they have been impliedly repealed. Of course there has been no legislative abandonment or repeal, because the Code of 1901, which has not been abandoned or repealed, expressly continues in effect acts of the Legislative Assembly relating to municipal affairs only, Section 1636, supra, and "any municipal ordinance or regulation," Section 1640, supra. And we are aware of no doctrine of implied repeal by executive abandonment. No precedent is adduced for any such doctrine. Non-use does not repeal. As Judge PRETTYMAN recognizes, the cases to which he refers but upon which he does not rely do not hold that executive non-use can repeal legislation. Three of the cases go back to earlier days in Pennsylvania, namely, James v. Commonwealth, 1825, 12 Serg. & R. 220; Wright v. Crane, 1826, 13 Serg. & R. 447, 452; Porter's Appeals, 1858, 30 Pa. 496, 499. The first held that the *common law* "ducking" or "cucking" punishment was no longer available for the offense of being a "common scold". No question of executive non-use of legislation was involved. The other two cases discuss a doctrine of obsolescence but refuse to apply it. And in a later Pennsylvania case, Homer v. Commonwealth, 1884, 106 Pa. 221, 226, it is said,

"*  *  *  It was long ago settled that an Act of Parliament cannot be repealed by *non user*. * * * The settled rule is, that a statute can be repealed only by express provision of a subsequent law, or by necessary implication. * * *"

Hill v. Smith, 1840, 1 Morris 70, is an Iowa case. The highest court of that state, in

Pearson v. International Distillery, 1887, 72 Iowa 348, 357, 34 N.W. 1, 5, attributed the decision in Hill v. Smith to inconsistent statutes, not to non-use, saying,

"*  *  *  It would surely astonish the profession should it be announced that * * * [criminal] statutes cease to have the force of law through non-user. We know of no principle which supports such doctrine. * * *"

Snowden v. Snowden, 1829, 1 Bland 550, 556, is a Maryland case in which the court, also rejecting repeal by non-use, said,

"*  *  *  No Judge or Court, either of the first or last resort, can have any right to legislate; and there can be no difference between the power to declare an Act of Assembly obsolete, and the power to enact a new law. * * *"

See, also, State v. Mellor, 1922, 140 Md. 364, 117 A. 875; 1 Sutherland, Statutory Construction § 2034 (3d ed.1943), and Painless Parker v. Board of Dental Exam., 1932, 216 Cal. 285, 14 P.2d 67, where it is said that delayed action by those charged with the execution of laws may be considered in mitigation of punishment but cannot annul the law. To like effect is Naughton v. Boyle, 1927, 129 Misc. 867, 223 N.Y.S. 432.

We refer to these cases which concern statutes not because we consider the 1873 regulations to be anything but municipal ordinances, but because the cases mentioned by Judge PRETTYMAN involve statutes. However, no decision is cited that a different rule regarding non-use applies to municipal ordinances and we think none exists.

The theory of repeal by abandonment rests upon the premise that the equal service provisions were conditions imposed upon licenses by the licensing authority. We think this premise erroneous in both fact and law. While the provisions are applicable to licensed businesses they are in no sense regulatory conditions imposed

laws cover some or even all of the cases provided for by [the prior act]; for they may be merely affirmative, or cumulative, or auxiliary.' There must be 'a positive repugnancy between the provisions of the new law, and those of the old; and even

then the old law is repealed by implication only *pro tanto* to the extent of the repugnancy'. See, also, Posados [Posadas] v. National City Bank [of New York], 296 U. S. 497, 504 [56 S.Ct. 349, 352, 80 L.Ed. 351]."

upon a license. There is a clear distinction. See Matter of Russell, 1912, 163 Cal. 668, 126 P. 875. A simple illustration will help. A business is required by municipal ordinance, for example, to clear from the sidewalk snow from the roof of its premises (Art. III, § 1, Police Regulations of the District of Columbia (1944)). This is a municipal ordinance regulatory of a licensed business; but it is not a condition imposed upon a license. Neither in words nor in purport are the equal service provisions a condition. The penalties which follow upon a court conviction of violation, including forfeiture of license without right of renewal for a year, assume a previously granted license. Like many other laws they regulate in a certain respect the conduct of a licensed business, but they are not like health or other requirements which must be satisfied before a license is granted. See, for example, §§ 47–2302 and 5–317, D.C.Code (1951), regarding fire prevention; Sec. XX of the Zoning Regulations, 1950, regarding a certificate of occupancy and previous inspection. The fact that hundreds of licenses have been issued without mention of the equal service provisions is therefore not significant. These same hundreds of licenses no doubt have been issued also without mention of any number of provisions applicable to the businesses concerned, such as those which fix minimum wages, maximum prices, regulate the employment of minors or require restaurants to have all draperies and decorations made of flameproof material (Art. XVII, § 2, Police Regulations of the District of Columbia (1944)).[47] The equal service regulations were not made by a licensing authority or administrative agency. They were enacted by the Legislative Assembly, which was a legislative body.[48] The power to regulate licensed businesses does not transform a legislative body into a licensing authority. No one would make such a suggestion with regard to Congress.

The concurring opinion makes still another assumption which we think is without basis, namely, that the licensing authority in this District in 1942, and perhaps at other unmentioned times, promulgated "apparently complete regulations" of restaurants but omitted the 1873 provisions, thus abandoning them. The 1942 regulations are solely health and sanitary regulations. In Section 2 they provide that no license shall be issued for a restaurant until the health officer certifies that the regulations have been complied with. But not even other conditions, to which we have referred, which must be satisfied before the license is granted, are included. They are not therefore abandoned. The 1942 regulations do not constitute and there is not in existence a complete codification of ordinances regulating restaurants, so that in fact there has been no omission of the equal service provisions from such a codification. Further, there not only is not,

---

**47.** One of the penalties which follow upon court conviction of violating the equal service provisions is forfeiture of license, which cannot be reissued for one year. This provision must be administered by the licensing authority, but it of course assumes that the penalized restaurant has previously been licensed.

It has been contended that the forfeiture provision takes the case out of the jurisdiction of the Municipal Court, but as we read the ordinance forfeiture is not for the court.

**48.** Section 30 of the Act of February 21, 1871, 16 Stat. 419, 425, creating the Legislative Assembly provided for "such ministerial officers as may be deemed necessary to carry into effect the laws of said District * * *." Pursuant to this authority the Assembly created the office of Register. Act approved Aug. 21, 1871, Laws of the District of Columbia, 1871–1872, First Session, c. LXIV, part ii, p. 71, 1 Laws of the District of Columbia 1871–1872 (D.C.Pub.Lib.Ref. No. + K859, D634A). Section 2 of this Act, id. p. 77, provided the Governor was to appoint the Register. He was responsible to the Governor, taking oath before him and executing a bond satisfactory to him. Act approved Aug. 23, 1871, Laws of the District of Columbia, 1871–1872, First Session, c. CVIII, §§ 14, 45 and 48, part ii, pp. 149, 161 and 162, id. By Act approved Aug. 23, 1871, Laws of the District of Columbia, 1871–1872, First Session, c. LXIX, part ii, p. 87, id., the Register was ordered to issue licenses, sign and impress them with the seal of his office.

there never was, any law, ordinance or regulation exacting a promise to comply with the equal service provisions as a condition for obtaining or renewing a license. Failure of the authorities to provide for such a promise is therefore the abandonment of nothing. Further still, Congress, in expressly saving from repeal acts of the Legislative Assembly relating to municipal affairs only, and expressly leaving unaffected the "operation or enforcement" of municipal ordinances and regulations, did not except the equal service provisions either by name or by excepting ordinances not theretofore the subject of court prosecutions. The concurring opinion seems to concede that acts of Congress cannot be repealed by non-enforcement or non-use. We see no reason why the same principle should not apply to ordinances which Congress has thus continued in effect.

The concurring opinion states that local officials as well as licensees have at times been ignorant of the equal service provisions. Ignorance of a law, while it might bear upon the penalty which should be imposed for its violation, does not place it out of operation. Ignorance of a *fact* may be material on the question of guilt where intent is an element of an offense, but this has nothing to do with the operative effect of a law.[49]

Comparison of present enforcement of the regulations with the imposition of a secret licensing condition is misplaced. Prior to the non-compliance here charged appellant Company was made aware of the regulations and of the position of the District that they were in effect. The Company's non-compliance rested upon its belief they were invalid or repealed, not upon ignorance of the regulations. It does not contend otherwise. Since there has been no secrecy our abhorrence of tyrannical attempts to impose punishment for violating

a law kept secret until after its violation should be reserved for an appropriate case. If the reference to secrecy is intended to analogize the present situation to one where ordinances applicable to a licensed business have been altered after grant of a license, few questions have become more firmly settled than that regulatory authority may validly alter the conditions upon which a going concern may continue to operate. Hadacheck v. Los Angeles, 1915, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348, involving a zoning ordinance; Northwestern Laundry v. City of Des Moines, 1916, 239 U.S. 486, 36 S.Ct. 206, 60 L.Ed. 396, involving a smoke abatement ordinance; Reinman v. Little Rock, 1915, 237 U.S. 171, 35 S.Ct. 511, 59 L.Ed. 900, involving an ordinance regulating livery stables; see, also, Queenside Hills Realty Co. v. Saxl, 1946, 328 U.S. 80, 66 S.Ct. 850, 90 L.Ed. 1096; Chicago & Alton R. R. v. Tranbarger, 1915, 238 U.S. 67, 35 S.Ct. 678, 59 L.Ed. 1204, and Atlantic Coast Line R. Co. v. Goldsboro, 1914, 232 U.S. 548, 34 S.Ct. 364, 58 L.Ed. 721.

There is no vagueness in the provisions alleged to have been violated. The Company makes no such complaint, and we see no possible application to this case of the sound and settled principle which condemns a criminal statute if it is so confusing or vague as to trap the innocent. United States v. Cardiff, 1952, 344 U.S. 174, 73 S.Ct. 189.

The truth is the regulations simply lay unused for many years. This does not justify the intimation that they were unknown to appellant Company until after it violated them, or that they are conditions imposed upon licenses, or that they have been abandoned by omission from non-existent compilations of regulations, or that they are vague. Because of long non-use, because of the legal question of the competence of the Legislative Assembly to

49. See Morissette v. United States, 1952, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288; United States v. Balint, 1922, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604; Shevlin-Carpenter Co. v. Minnesota, 1910, 218 U.S. 57, 70, 30 S.Ct. 663, 54 L.Ed. 930; Reynolds v. United States, 1878, 98 U.S. 145, 167, 25 L.Ed. 244; New York Cent. & H. R. R. Co. v. United States, 2 Cir., 1917, 239 F. 130; Hemans v. United States, 6 Cir., 1947, 163 F.2d 228, certiorari denied, 332 U.S. 801, 68 S.Ct. 100, 92 L.Ed. 380, rehearing denied, 332 U.S. 821, 68 S.Ct. 152, 92 L.Ed. 397; Blumenthal v. United States, 8 Cir., 1937, 88 F.2d 522.

enact them, and because of the question whether they have been repealed, the District authorities seek to establish their legal status before insisting upon general compliance. This is a reasonable course to pursue.

III. The position that the equal service provisions are not now enforceable because of abandonment or non-use by officials who are said to have had control over them as licensing conditions leads inevitably to the conclusion that such officials can now revive and enforce them. To repeal a regulation is to make a regulation, and whoever can do the one can do the other. The abandonment argument in the end destroys itself insofar as this case is concerned, for if these regulations can be placed out of operation by non-use on the part of District officials they can be put back into operation by use on the part of the same officials.

IV. We are concerned only with the equal service provisions of the Act of 1873, not its requirements for filing sales prices, et cetera. The latter are not now involved. They may call for administrative or legislative revision, or coordination with subsequent legislation. We do not deny that long non-use of regulations creates some problems, but they can be solved without repudiating the regulations. As the concurring opinion states, it is not for courts to determine what the law on the subject ought to be. If an ordinance which required segregation rather than equal service were before us, and if it were found to be constitutional, as to which we express no opinion, the same approach we now take should be followed. The ordinance before us was enacted by a legislative body and has always been subject to legislative modification or repeal. No modification or repeal has been enacted. On the contrary, by the Code of 1901 Congress expressly kept in operation the municipal ordinances and regulations of the Legislative Assembly, which include the equal service regulations. Whether we approve or disapprove of these regulations we cannot, within the normal limits of the judicial function, say they shall not be the law.

We have not separately discussed the Company's suggestion that the equal service provisions have become unenforceable by reason of obsolescence. It is enough to point out that custom has not moved away from equal treatment, leaving these regulations derelicts of the past. Custom has moved toward equal treatment, as is shown by developments of recent years in the Government, in the armed services, in industry, in organized labor, in educational institutions, in sports, in the theatre, and in restaurants in this community, as examples. Neither time nor neglect should bar the legislative application to licensed restaurants in this community of the principle which opposes discrimination on account of race or color. We would affirm the judgment of the Municipal Court of Appeals.